## ILA DAVIS et al., Respondents, v. MODERN WOODMEN OF AMERICA, Appellant.

### Kansas City Court of Appeals, April 6, 1903.

1. **Benefit Societies: INSURANCE CERTIFICATE: DUEL.** The word "duel" in a benefit society insurance certificate has its ordinary signification, and is a combat with deadly weapons between two persons by some prearrangement and understanding, and perhaps with some formality; and the affray in which the insured was killed is held not to have been a duel.

2. **———: ———: VIOLATION OF LAW: EVIDENCE.** On a review of the evidence it is held that the deceased, by taking his shotgun and waiting at his gate for the expected return of his adversary and thereby bringing on the affray in which he lost his life, was guilty of violation of the law provided against in the certificate, and the beneficiary is precluded from recovery. (Harper v. Insurance Co., 18 Mo. 516, and Overton v. Insurance Co., 39 Mo. 122, distinguished in opinion on motion for rehearing.)

3. **———: ———: ———: MURDER: MANSLAUGHTER.** If a party accept a proposition and remain in waiting for a mortal combat, it becomes a voluntary combat with murder at the door

of the survivor; and if the conflict was sufficiently sudden to relieve of murder, the survivor would at least be guilty of manslaughter.

4. ———: ———: UNLAWFUL ACT: TRESPASS: MANSLAUGHTER. If one has committed a trespass or threatens to do so, the party trespassed against is not justified in arming himself to resist it, since, while a man may protect his property he can not go to the extent of killing the trespasser; and if he do so he is guilty of manslaughter.

5. ———: ———: VIOLATION OF LAW: ARMING SELF: BUSINESS. While one may arm himself and go about his business with a view to defend himself in case of attack, he can not arm himself and go to his enemy for the purpose of attacking or being attacked.

Appeal from Vernon Circuit Court—*Hon. H. C. Timmonds,* Judge.

REVERSED.

*King & Elliott* and *M. T. January* for appellant.

(1) Where the positive unimpeached testimony of eye-witnesses is sustained by the physical facts and there is no substantial evidence to the contrary, the case should be withdrawn from the jury. Bank v. Bank, 151 Mo. 320; Kornfeld v. Supreme Lodge, 72 Mo. App. 604; Jackson v. Hardin, 183 Mo. 175; Reichenbach v. Ellerbe, 115 Mo. 588; Fulbright v. Perry Co., 145 Mo. 433; Sehr v. Lindemann, 153 Mo. 276; Schierbaum v. Schemme, 157 Mo. 1; May v. Crawford, 150 Mo. 504. (2) A party who seeks and provokes a difficulty can not set up the plea of self-defense. And if in such case he assaults another with a deadly weapon and is himself killed, his death is necessarily the result of a violation or attempted violation of the law. State v. Brown, 63 Mo. 439; State v. Gamble, 119 Mo. 427; State v. Hudson, 59 Mo. 135. (3) Where two parties voluntarily enter into a combat with deadly weapons, under an agreement to fight, expressed or tacitly understood, the act constitutes a duel.

*Scott & Bowker* for respondents.

(1)   One has a right to protect his home and property, even to the extent of taking life if it becomes necessary, and, therefore, has a right to arm himself when he goes out toward the intruder.   State v. Roper, 141 Mo. 327.   (2)   In order to deprive a person of the right of self-defense on the ground of voluntarily entering into a difficulty, it must be shown that he did so for the purpose of wreaking his malice or taking the life of his adversary or doing him some great bodily harm.   State v. Adler, 146 Mo. 18; State v. Rapp, 142 Mo. 443.   (3) The fact that one puts himself in the way of being assaulted by another, though he expects the latter will attack him, does not preclude him from setting up self-defense.   State v. Evans, 124 Mo. 410; State v. Matthews, 148 Mo. 185.

ELLISON, J.—This action is based on a benefit certificate of life insurance issued by defendant to John W. Davis in the sum of three thousand dollars; one thousand for the benefit of his wife, and two thousand for his surviving children.   He died leaving a widow and two children.   The widow assigned her interest to the children and they are the plaintiffs seeking to recover the full amount of the certificate.   They obtained judgment in the trial court.

The certificate contained two provisions which bear upon the case:   They were that, if Davis's death "occurred in consequence of a duel, or of any violation or attempted violation of the laws of any State or Territory of the United States," the certificate should become void.   Davis was shot and killed by one L. E. Bryan at the side of the public road in front of his house.   The defense to the action is based upon the contention that he was killed, either in a duel with Bryan or while engaged in a violation of the law of the State.

1.   We think the word "duel," as it appears in

the present contract, was used in its ordinary significa-
tion and with the meaning which is ordinarily attached
to the term; that is, a combat with deadly weapons be-
tween two persons by some prearrangement and under-
standing and, perhaps, with some formality. And so the
word is doubtless understood when found in our laws
placing certain disabilities on those who may engage in
a duel. Herriot v. State, 1 McMullan 126; 1 Bouvier's
Law Dict. The evidence in the record fails altogether
to show that the encounter between Bryan and the de-
ceased was of such character as to be classed as a duel,
and we therefore reject that theory of defense.

2. We have then only to consider the other cause of
defense, viz., that the deceased came to his death in con-
sequence of a violation of the law. The evidence took a
wide scope and this was quite natural when the char-
acter of the difficulty, the length of time it had been
brewing, and its unfortunate ending is considered. Da-
vis was killed by Bryan early in the morning of the 3d
of July, 1901. The evidence shows that Bryan, Davis
and one Chaney were farmers living in the same neigh-
borhood in Vernon county. That Bryan lived on a pub-
lic road running east and west which connected with a
road running north and south on which Davis and
Chaney lived, Bryan's house being about three-fourths
of a mile from Davis's; and Chaney's premises and
pasture gateway being a short distance beyond Davis's.
Shortly after daylight on the morning of the 3d of July,
Bryan discovered that one of his mules was missing.
He saw by tracks in the middle of the road that it had
gone east towards the north and south road. He (as he
stated, supposing it had been stolen) then saddled a
pony, got his shotgun, and started out in hunt of the
mule. He traced it by the tracks on the north and
south road past the Davis premises and on until it
turned into the gate into Chaney's pasture. He, with
Chaney's assistance, drove it out into the road headed
for home; he following on the pony.

These are uncontroverted facts, and we come now to what the records show as to acts of the two men towards each other and which resulted in Davis being killed. Davis and his wife were at the breakfast table that morning as Bryan was coming north on the road approaching their house, and Mrs. Davis saw him through the window as he came riding north and saw that he had a gun. She called her husband's attention and he, too, saw him. He then went to the front door, the upper half of which was glass, looked out, turned back and got his shot gun and went out into the yard. Bryan testified that he (Davis) hailed him in a "loud and infuriated" tone, but that he could not hear what he said, but that Davis followed him on up the road towards Chaney's for a considerable distance. Mrs. Davis stated that when her husband got the gun and went out the front door, she did not see either of the men but that she could hear that they were saying something to each other. After Bryan had gone by and was in Chaney's pasture getting the mule, Mrs. Davis went out to the yard gate and found that her husband was at the big gate leading into the lot, and he came down to where she was, but it was not known what they said together. She then returned to the house and Davis to the lot gate. The fences along this road were hedge and Davis's lot gate set back in a recess of some four or five feet, so that one standing at the gate would be at least partially hidden from the view of one coming along the road. Here Davis waited fifteen or twenty minutes. That he waited for Bryan's return is not questioned, When he did return along the road and got about opposite to where Davis was standing each began firing at the other, with the result that the shot fired by Davis tore off the muscle of Bryan's arm and the shot fired by Bryan struck Davis in the side, from which he died within an hour. There was much evidence on the question of which of the two fired the first shot. And so a great deal of testimony was given as to threats made

by Bryan beginning back five or more years when Davis fired at him with a pistol and assaulted him with a knife and a pick-axe. Evidence was given tending to show that Bryan entertained a feeling of wicked and deep-seated malice for Davis, and that he rejoiced over having killed him. Bryan denied the threats and the expression of pleasure at having killed him, but for the purpose of disposing of the case we will assume that he made the threats and that his feelings were as indicated by some of the witnesses. We will further assume that when he came upon Davis on his return from Chaney's he fired the first shot, and thus put an end to a large part of the argument laid before us.

Yet, with all this conceded, does not the evidence which remains undisputed, in fact, the evidence offered by plaintiffs, establish that Davis was engaged in an unlawful act? His conduct from the time he saw Bryan riding along the public road in hunt for the mule until he was shot, was one continuous act. It consisted in seeing Bryan riding in the public road which led by his house armed with a gun. Arising from the breakfast table, looking out of the front door, getting his shotgun and going out into the yard, engaging in a wordy controversy with Bryan, and thence going to the gate leading from the road into his feed lot, and there, gun in hand, remaining in wait for Bryan's return. There is no evidence that Bryan did anything to excuse Davis in doing this. Bryan was engaged in hunting his mule and must have passed on by the Davis place, notwithstanding the words between him and Davis, for when Mrs. Davis, hearing the talk between the men but not understanding what was said, sent her daughter out, the child saw that Bryan was near to Chaney's. There is no word of testimony and nothing upon which to base a reasonable or substantial inference, that Bryan did anything to justify Davis in remaining in wait for him armed for a deadly conflict.

It is manifest from the testimony in behalf of

plaintiffs, allowing it the extremest limit of inference within the bounds of reason, that but for the unwarranted act of Davis in arming himself and going out to molest Bryan, by word or deed, he being a mere traveler on the public highway, no difficulty would have occurred. And Davis did not stop at that. Whatever may have been said between them relating to a personal encounter, Bryan had passed on and no difficulty would have occurred but for Davis taking up a position by the roadside, in the recess of his gateway, and remaining in wait for Bryan's return. These acts of Davis were unlawful—were in violation of the law of the State, and of his contract with this defendant.

Let it be supposed that Bryan had gone so far as to say to Davis when he came out of his house that he, Bryan, would pass back in a short time and that if he would remain outside the house he would kill him. There is no evidence of this, and we make use of the supposition merely by way of illustration. Davis accepted the proposition (if made) and remained outside in wait for the mortal combat. His act was still unlawful. It would have been a voluntary combat with murder at the door of the survivor. State v. Underwood, 57 Mo. 40, 50. And even should we go so far as to allow that the conflict between the two men was sufficiently sudden to relieve the survivor of murder, yet he would at least be guilty of manslaughter. State v. Davidson, 95 Mo. 155; State v. Parker, 106 Mo. 223.

Confessedly, Davis's act brought about his death, but plaintiffs urge that such act was not wrongful and that he had a lawful right to arm himself and go out to meet Bryan and to remain out to meet him on his return in order to prevent him from making some trespass or offense against his property. We have already stated that there was no evidence whatever that Bryan had committed a trespass on his property, or had threatened to do so on his return. But if he had, such act, or threat did not justify Davis in arming him-

self with a deadly weapon with which to resist it. One may protect his property and resist a trespass upon it, but he can not go to the extent of killing the trespasser; and if he do so he will be guilty of manslaughter. State v. Matthews, 148 Mo. 194-197. He should have asked redress of the law and not gone to the extremity he did.

And so plaintiffs likewise insist that Davis had a right to arm himself and go out and remain out, even to meet an attack from Bryan. The case of State v. Evans, 124 Mo. 410, is cited in support of the proposition. That case is perhaps authority to sustain the act of a man in arming himself and going to a place (for some lawful purpose) where his enemy is, in the expectation that such enemy will attack him. But it by no means supports the idea that one may arm himself and go to his enemy for the purpose of being attacked, or himself attacking his adversary. Such construction of the law would break away all barrier to mutual murderous combats. In the case referred to, the defendant went into a field where his adversary was for the purpose of getting some corn for his hog. He was armed and expected that his adversary might attack him and he was expecting to resist him if he did. He did not go to the field to meet his adversary for the purpose of a conflict, but he went for the lawful purpose of getting some corn. While in this case, Davis, armed with a shotgun, went out to meet Bryan either in mutual combat, or to resist with such weapon some imaginary or real trespass. He broke the law in either view and thereby broke his contract with defendant and the beneficiary cannot recover.

We have arrived at this conclusion after a careful consideration of the evidence and after having given to that in behalf of the plaintiffs every legitimate inference which reason or the law permits, and in consequence we must hold that defendant's peremptory instruction should have been given.

The judgment is reversed. All concur.

OPINION ON MOTION FOR REHEARING.

ELLISON, J.—In support of a motion for rehearing our attention has for the first time been called to the cases of Harper v. Ins. Co., 18 Mo. 109, and Overton v. Ins. Co. 39 Mo. 122. The foregoing opinion in no way conflicts with those cases. It is true that Judge Scott, because of the clause in that policy (not found in the one in controversy) viz., "if the party shall die by the hands' of justice," remarked that such words showed that the parties meant by the succeeding words, "in the known violation of any law," that the policy would not be avoided unless the killing of the insured was justifiable. Notwithstanding that expression, no one would contend that it was meant to say, that if the insured met his death in a mutual murderous combat, he would not avoid the policy, although his killing was not justifiable. If two start out to meet, each bent on murdering the other, the killing of either would not be justifiable, and yet each would be guilty of a felony; one of actual murder and the other of an attempt to murder. That this is the correct view of that decision is shown by the statement of the judge that the clause of the policy now in controversy covered those instances in which the insured died in the commission of a felony. That Davis was committing, or did commit, a felony when he met his death, we think is sufficiently demonstrated by the facts stated in the opinion.

The Overton case decides that where the insured met his death in an encounter such as that if he had killed his adversary he would have been justified, the terms of the policy were not violated. But no one could say that if the effect of the shots exchanged by Bryan and Davis had been just the reverse of what they were, Davis would have been justified and exonerated in the eye of the law.

Vol 98 app—46.

Davis v. Modern Woodmen.

If we could find ourselves supported by the law we would readily lend our aid to these children in their effort to sustain the policy. But finding no legal justification for the judgment we must overrule the motion and order its reversal. All concur.