IDA MULVANEY BOSLER, APPELLEE, v. MODERN WOODMEN
OF AMERICA, APPELLANT.

FILED DECEMBER 19, 1916. No. 18662.

1. **Insurance: FORFEITURE: VIOLATIONS OF LAWS.** A provision in a certificate of membership in a fraternal beneficiary society that, if the death of a member holding such certificate shall occur in consequence of any violation or attempted violation of the laws of any state or territory or of the United States, "then the certificate shall be null and void and of no effect," is a reasonable and lawful provision.

2. ———: ———: ———. And where the holder of such a certificate, while he is in the act of committing a violent and unprovoked assault upon another, is shot and killed by the person whom he is assaulting under the conditions described in the opinion, no recovery can be had by his beneficiary upon such certificate.

3. **Evidence: WITNESSES: INTEREST.** And, in such a case, the fact that the slayer is the only eyewitness of the killing, and is the only witness who testifies to the facts leading up to the act, will not permit the jury to disregard his evidence on the ground of personal interest, when his testimony is corroborated by another disinterested, credible witness, and by facts and circumstances established at the trial.

APPEAL from the district court for Lancaster county: P. JAMES COSGRAVE, JUDGE. *Reversed.*

*T. S. Allen* and *Truman Plantz,* for appellant.

*J. A. Brown, contra.*

FAWCETT, J.

Defendant is a fraternal beneficiary society, and Lawrence Mulvaney, deceased husband of plaintiff, was at the time of his death a member in good standing. On December 6, 1908, while engaged in a controversy with one James Finley, Mulvaney was shot and instantly killed by Finley. Plaintiff, as the beneficiary named in the certificate of membership of her husband, recovered judgment in the district court for Lancaster county for the full amount thereof. Defendant appeals.

The defense interposed by the defendant society is based upon the following clause in the certificate of membership: "If the member holding this certificate shall be expelled from this society, * * * or if his death shall occur in consequence of a duel, or of any violation or attempted violation of the laws of any state or territory or of the United States, * * * then this certificate shall be null and void and of no effect, and all moneys which have been paid and all rights and benefits which may have accrued on account of this certificate shall be absolutely forfeited and this certificate become null and void." It is alleged that the death of Mulvaney occurred in consequence of a violation by him of the laws of the state of Wyoming, in that on December 6, 1908, in Natrona county, Wyoming, Mulvaney committed an assault upon Finley, and Finley, while defending himself from this assault, shot and killed Mulvaney; that the assault was in violation of the laws of the state of Wyoming. Section 4957, Rev. St. 1899, then in force, provides: "Whoever, having the present ability to do so, unlawfully attempts to commit a violent injury on the person of another, is guilty of an assault and shall be fined in any sum not exceeding fifty dollars."

The evidence shows that Mulvaney was engaged in the sheep business in Wyoming, and was grazing his sheep near the North Platte river. Finley was employed by one Josendal, a sheep raiser, to move his herder's camp from place to place and to provide provisions for the herder. In the performance of his duty, he moved Josendal's camp so as to locate it near what was called the Bryan homestead, which was also located on the Platte river, and which Josendal had leased. Finley proceeded north from Alcova for a certain distance, then turned off the main road up a draw, in which it appears Mulvaney's camp was located, and about noon pitched his camp about two miles from the river, and about a mile beyond Mulvaney's camp. His outfit consisted of a sheep wagon, a supply wagon, four draft horses and a

saddle horse. The sheep wagon was so constructed that the bed of the wagon projected over the wheels, so as to make it about six feet wide. It was covered with a canvass top, and had a window at the rear and a door in front. The door was about two feet wide and a little to the left of the center of the front. Near the front of the room thus created, and to the right as one entered, there was a stove, upon which the occupant cooked his meals. A bed was located across the rear of the room. In addition to the bed and stove, the wagon contained a few cooking utensils and provisions. The only eyewitness to the killing was Finley. He was called as a witness for defendant, and testified substantially as follows: On the day in question he pitched his camp about a mile from Mulvaney's camp. About half an hour after locating his camp, he saw Mulvaney, with whom he was well acquainted, approaching on horseback. At that time he (Finley) was in his camp wagon. He had started a fire in the stove in his wagon to melt ice and to prepare lunch for himself. When Mulvaney rode up, he saluted Finley, "How are you, Jim?" and Finley answered, "How are you, Mulvaney?" Mulvaney rode up close to the end of the tongue of the wagon in which Finley was standing, got off his horse, and then said to Finley: "Don't you think you are coming in pretty close?" The following questions and answers in Finley's examination explain what occurred: "Q. What did you say? A. I said, 'No; Josendal has a right to water at the Bryan homestead, and I could not very well get to water there, and if I set further down I was crowding you and Ed. Royce, and be in between you, and I thought if I got down here I would be out of the way.' He said, 'I am taking all I am going to do off from this outfit,' and said, 'I am going to give you the worst beating I have given anybody.' Q. What did he do? A. He took off his coat and gloves, and threw them on the ground. Q. What did he say? A. And started for the wagon. I said, 'I can't fight you, and I don't want any trouble, and I

want you to go off and let me alone.' Q. How near did he come? A. Got up on the doubletrees; they are fastened on the wagon in front. Q. What did you say? A. I pulled my gun and I said. 'Mulvaney, don't come in here or I will shoot, sure.' Q. Did you point the gun at him? A. Yes, sir. Q. What did he do then? A. He hesitated on the doubletrees a second or so, and then started into the wagon, kind of crouching down. Q. What did you do? A. I pulled the trigger. Q. How did he appear when he was coming into the wagon? A. Well, he appeared pretty mad. Q. And were you afraid of him? A. Yes, sir. Q. Why were you afraid of him? A. Well, I am not a fighting man, and I never had a fight in my life, and I knew he was able to handle me any way he wanted to. Q. And from his appearance and conduct, you knew he was mad? A. Yes, sir. Q. And did you think he intended to do you bodily harm? A. Yes, sir. Q. You did? A. Most assuredly, he intended to.  *   *   * Q. You had known Mulvaney for some time? A. Yes, sir; two or three years. Q. Had you ever lived with him in a sheep wagon? A. Yes, sir. Q. You may state whether or not he knew your physical condition? A. Yes, sir; he must have known it. We slept together and he could see the truss. Q. After you fired the shot, what then happened to Mulvaney as you saw? A. He still kept coming. Q. Did he fall? A. He started to fall. Q. In the wagon? A. Yes, sir. Q. What did you do? A. I brushed by him, and got on my horse. Q. Then what did you do? A. I went as hard as I could to Alcova." On reaching Alcova he reported what had occurred, and requested one or two parties and also a physician to go out to the camp and ascertain the condition of Mulvaney, stating to them that he thought he had killed him. He then surrendered himself to the deputy sheriff, and told him the same story.

If this testimony of Finley is to be believed, the defense of the society was fully established. Is there anything in the record that would justify the jury in

disbelieving it? Within a day or two after the occurrence, a coroner's jury was called. The jury visited the scene of the tragedy, took the testimony of Finley and other witnesses, and held Finley blameless. It has been said in discussion that the fact that Finley was held blameles by the coroner's jury does not free him from prosecution for the killing of Mulvaney, but that he may yet be prosecuted for that act, and that he has, therefore, a great motive for fastening upon Mulvaney the blame for his own death. While it may be seriously doubted that a jury in a civil action has the right to absolutely discredit the uncontradicted testimony of a competent witness, even if it has no corroboration, we need not decide that point, for the reason that, if that were to be conceded, it would not justify the rejection of Finley's testimony in this case. His testimony is strongly corroborated by conceded facts and circumstances, and by the testimony of the witness Holden Peterson. Mr. Peterson testified that both Finley and Mulvaney were friends of his; that he remembered the time when Mulvaney was killed; that in the afternoon of the day he was killed Mulvaney came to his blacksmith shop to get something that witness had been fixing for him; that he was on horseback; that "he seemed very much excited and angry, and when I asked him about a certain sheep wagon which was in the road, and asked if it did not belong to Finley, who was working for Josendal, he said it did, and that Finley was——." He testified to the vilest kind of a name imaginable that Mulvaney applied to Finley, and, continuing, said: "And that if he saw him today he would tell him so. He was always a quick acting and moving man, and jumped on his horse and rode off in a hurry. I thought he was very angry from the way he acted. He was at my place not more than an hour before the time he was shot by Finley, according to what I learned at the inquest of the time of the shooting."

Here is positive proof as to Mulvaney's feeling toward the man whom he assaulted an hour later. What about the circumstances corroborating Finley's testimony? Finley was in his own camp. Mulvaney, whose camp was a mile at least away, appeared upon the scene. After the salutations, "How are you, Jim?" and "How are you, Mulvaney?" he alighted from his horse and opened the affray with the question above quoted, "Don't you think you are coming in pretty close?" and made the threat that he was going to give Finley the worst beating he had ever given anybody. Why did Mulvaney go from his own camp to Finley's? The reason for his going is shown in the testimony given by Mr. Peterson, who said he was "very much excited and angry." Although the land on which Mulvaney was camped was government land, he resented any imagined encroachment upon his domain by other sheep men, and decided he would put an end to it by giving Finley a beating that would cause him to move on. In addition to the fact that he is shown to have been in an angry mood, and that he had gone from his camp to the camp of Finley, we have the corroborating testimony of witnesses, to whom Finley reported the shooting, and who immediately went to the scene of the tragedy, that they found Mulvaney lying with his face down, just inside the door of Finley's wagon. This corroborates the testimony of Finley that at the time he pulled the trigger he (Finley) was at the rear end of the room, close to his bed, and that Mulvaney had entered, or was in the act of actually entering, the room, when he fired. His testimony is that he was just inside of the door of the wagon, and Mulvaney was up to the double-trees when he first warned him "to go off and let me alone;" that, when he fired and Mulvaney fell inside of the wagon, he had to brush past him as he rushed out. It is apparent, therefore, that Finley had retreated until, figuratively speaking, his "back was against the wall." Finley's wagon was at the time his dwelling. It was his castle. He had a right to stand his ground in that castle

and defend it from all assailants, even to the extent of taking his assailant's life. But, it is said in argument, Mulvaney was not armed himself; that he undoubtedly intended to commit an assault upon Finley (he was already committing an assault, and intended to commit a severe battery) without use of weapons of any kind, and he could not apprehend that a deadly weapon would be used against him by Finley, and had no reason to believe that his death might result from his encounter with Finley. We are unable to understand how Mulvaney could not apprehend that a deadly weapon would be used against him by Finley, when Finley was standing with a gun leveled at him, telling him that, if he attempted to enter the wagon, he would shoot. Nor are we able to understand how it can be said that Mulvaney had no reason to believe that his death might result from his encounter with Finley. If he did not believe that Finley would shoot, why did he crouch down and make a rush? The argument is unsound. To hold in line with the contention above outlined would be to declare the rule in this state to be that, when a man is standing inside the threshold of his own house, and a rival in business appears upon the scene, tells him he is going to give him a severe beating, starts up the front steps for the purpose of carrying his threat into execution, the occupant of such home may not defend it, or himself, with a gun if necessary, but must engage in a personal physical encounter with his assailant in his own home. We are unwilling to establish such a rule. In *Hoover v. De Klotz,* 89 Neb. 146, 148, we held: "This court is not committed to the doctrine that a person unlawfully assaulted must fly to the wall before he may lawfully strike a blow in self-defense, but, on the contrary, we have said as a general proposition that a person unlawfully assaulted may stand his ground and repel force by the exercise of such force as to him reasonably seems necessary to protect his person or property from injury."

In addition to what has been said upon the merits of the case, there is prejudicial error in the instructions given by the court. The question for the jury to determine was: Did Mulvaney's death occur in consequence of his violation or attempted violation of the laws of the state. Prize-fighting is now a violation of the law in nearly every state in the Union. Surely, no one will claim that the holder of a certificate in defendant society could engage in a prize-fight, meet his death while so engaged, and the society be held liable because his opponent struck him a needless blow which killed him. The society in such a case would be released from liability for the member's death, by reason of his violation of the laws of the state, and not by reason of anything his antagonist may have done.

By instruction No. 8 the jury were instructed: "If a person shoots another who assaults him through mere cowardice, or under circumstances which the jury find from the evidence are not sufficient to induce a reasonable and well-grounded apprehension in the mind of an ordinarily courageous person of danger to life or great bodily harm, the law will not justify the shooting on the ground of self-defense, and in this case, if you find that under this rule Finley was not justified in shooting Mulvaney, then your verdict should be for the plaintiff."

By No. 9 the jury were instructed: "That before a person can justify the taking of the life of a human being on the ground of self-defense, he must, when attacked, employ all reasonable means within his power, consistent with his own safety, to avoid the danger and avert the necessity of killing. And if in this case the jury find from the evidence that Finley might reasonably have repelled the alleged assault of Mulvaney with his hands or feet or other weapon within his reach, less deadly than the revolver, then the shooting of Mulvaney was not justifiable as a matter of self-defense."

100 Neb.—37

No. 10 reads: "Gentlemen of the jury, the court instructs you that the alleged assault by the deceased would call for a repulsion of it on the part of Finley by just such force as was necessary to overcome it, and more than that would be unlawful. And if the jury find from the evidence that the alleged assault by Mulvaney was in fact repelled by more force on the part of Finley than was actually necessary, then the killing of Mulvaney by Finley would not be justifiable, and the plaintiff would be entitled to recover the full amount of the benefit certificate."

That the defense pleaded by defendant, under the terms of its benefit certificate, is a valid defense, and that under the evidence it should have been sustained, is fully shown in *Travelers Ins. Co. v. Seaver*, 19 Wall. (U. S.) 531; *Murray v. New York Life Ins. Co.*, 96 N. Y. 614; *Bloom v. Franklin Life Ins. Co.*, 97 Ind. 478; *Gresham v. Equitable Accident Ins. Co.*, 87 Ga. 497; *Davis v. Modern Woodmen of America*, 98 Mo. App. 713; and by the numerous authorities cited in those cases.

The court also committed prejudicial error in not giving instructions 9 and 10, requested by defendant. They correctly state the law as shown by the cases above cited, and are in harmony with the evidence adduced at the trial. A case very much in point is *Woodmen of the World v. Hipp*, 147 S. W. (Tex. Civ. App.) 316.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

Rose, J., dissents.