THE STATE v. MATTHEWS, Appellant.

Division Two, February 21, 1899.

1. **Murder**: EXPRESS MALICE: SELF-DEFENSE. One who kills another in self-defense is not guilty of murder, though he bore express malice towards deceased.

2. **Self-defense**: RIGHT OF ATTACK. It is not generally true that the right of self-defense does not imply the right of attack. One who has reasonable ground to believe that another intends to do him great bodily harm, and that such design will be accomplished, need not wait until his adversary gets advantage over him, but may immediately kill the latter, if necessary to avoid the danger.

3. ———: WHEN INVITING ATTACK. The fact that one puts himself in the way of being assaulted by another, though he expects the latter will attack him, does not preclude him from setting up self-defense.

4. **Manslaughter**: KILLING ONE DESTROYING FENCE. Though one is not justified in killing another who is tearing down and carrying away a fence belonging to the former, such killing is nothing more than manslaughter in the fourth degree, if done in a heat of passion engendered by the removal of the fence.

5. ———: ———: INSTRUCTIONS. Where defendant shot deceased while the latter was removing the former's fence, an instruction that such fact did not justify defendant is misleading, as it should also state that, if the killing was done in the heat of passion, it would be only manslaughter.

6. ———: ———: ———: RIGHT TO DEFENSE OF SELF-DEFENSE. The fact that defendant claims that the killing was done in self-defense does not destroy the right to an instruction based on the claim that the killing was manslaughter.

*Appeal from Douglas Circuit Court.*—HON. W. N. EVANS, Judge.

REVERSED AND REMANDED.

A. H. LIVINGSTON for appellant.

(1) The instructions as a whole are too strongly colored and emphasized for the State, and not broad enough to

fairly cover defendant's grounds of defense. They direct the jury to find defendant guilty. Instruction numbered 13 is not the law. It may be part of it, but not all of it. This instruction only goes part of the way, and stops short where it should contain the law for defendant under the facts. This court has lately expounded the law on this proposition in the Grugin case, 147 Mo. 39, and the rule of reason and common sense now prevails. While the trial court was not asked to instruct on manslaughter in the fourth degree, yet the jury should have been told the full law of opprobious and insulting epithets. ‧ (2) Instruction numbered 17 is clearly erroneous. There is no evidence on which to base it. Defendant surely had the right to arm himself for protection against a mob and forbid it from destroying his property. The jury were so told in instruction numbered 23. If so, then the instruction numbered 17 has no place in this case. If the principle sought to be declared in the instruction, was proper under the facts of the case, then the wording and phraseology are clearly erroneous, and not supported by any case in this State. "The right of self-defense does not imply the right of attack and will not avail in any case where the difficulty is sought for, or induced by the party, etc." Nothing was said or done by defendant before the fatal shot except to forbid trespassers and warn them away. This he had a right to do. Wharton's Crim. Law, sec. 624. We insist that this instruction has no place in the case, and for its giving the judgment should be reversed. State v. Evans, 124 Mo. 397; State v. Robb, 142 Mo. 443. (3) Instruction numbered 18 is clearly erroneous because, if for no other reason, it singles out a certain fact and makes the whole case turn upon the finding of the jury thereon. State v. Sivil, 105 Mo. 530; State v. Bell, 70 Mo. 633; State v. Harris, 59 Mo. 556; State v. Smith, 53 Mo. 267; State v. Hundley, 46 Mo. 414; State v. William, 136 Mo. 293. Besides this instruction is not the law in any case. The appearances of danger may be false, not exist in fact; yet if

State v. Matthews.

they are such as to give the defendant good reasons to believe their existence, he is justified in acting upon appearance. All the law of self-defense is annihilated by this instruction. (4) We submit that the caption of the instructions is erroneous and calculated to mislead a jury. Such caption is unnecessary, but if one is given it should contain more than the word "murder."

EDWARD C. CROW, Attorney-General, and SAM B. JEFFRIES, Assistant Attorney-General, for the State.

(1) The evidence in this case is sufficiently strong and convincing to support the verdict found by the jury, to wit, murder in the second degree. (2) The first assignment of error is the action of the lower court's failure to instruct on lower grades of manslaughter than murder in the second degree, but defendant has presumably abandoned the contention. The testimony fails to disclose the remotest tendency to any offense other than that which was instructed upon. In view of defendant's and all the other testimony in the case no instructions, other than for murder in the first and second degrees and self-defense, could have been legally given. In this no error was committed. Where the defendant testifies that he shot the deceased in self-defense no instruction for manslaughter in the second degree should be given. State v. Stiltz, 97 Mo. 20. Nor can it be said that manslaughter in the first degree should have been instructed upon. There was no testimony upon which to base the same. State v. Lockwood, 119 Mo. 463; State v. Downs, 91 Mo. 19; State v. Sloan, 47 Mo. 604. By the unmistakable provisions of this section there can be no such instruction for manslaughter in the third degree, when the killing is as the evidence shows. State v. Pettit, 119 Mo. 410; State v. Dunn, 80 Mo. 681; State v. Watson, 95 Mo. 411; State v. Edwards, 70 Mo. 480; State v. Curtis, 70 Mo. 600. No instruction for manslaughter in the fourth degree was necessary. The evidence shows no

such provocation as will reduce the offense to manslaughter in the fourth degree. The act is admitted by defendant, and his excuse or justification therefor is self-defense. State v. Ellis, 74 Mo. 207; State v. Kotovsky ,74 Mo. 247. For all that is shown by the record, the deceased was going quietly about in the peace of the State, pursuing his own work. It is true he had previously procured the revolver, but for what purpose it was not disclosed, nor was such fact brought to the knowledge of defendant until after he had gone to his own home, secured the gun, and ordered deceased to leave the rock in question unmolested. It is too well settled to admit of question that words alone, however provoking or insulting, will not reduce the killing to manslaughter, though they may reduce from murder in the first degree to murder in the second degree. State v. Branstetter, 65 Mo. 149; State v. Elliott, 98 Mo. 156; State v. Barker, 109 Mo. 674; Whart. on Hom. (2 Ed.), sec. 393. We therefore submit that under the evidence the killing was either murder in the first or second degree or was committed in self-defense, and no error was committed by failing to instruct upon a lower grade of manslaughter. (3) Defendant attacks instruction numbered 17, and, as reason therefor, asserts lack of evidence to support it. In this connection the statement of facts by defendant is incorrect. While the defendant may have had the right to request deceased to desist removing the rock in question, he had no right, under the circumstances, to procure a gun and take the life of a person deemed by him to be a trespasser against his property, and who was in no wise trespassing upon his person. Even though the defendant had a right to the rock in question and the deceased was a trespasser, the civil courts were open to defendant for damages and the criminal courts open for punishment, which are presumed to be adequate in all cases. That the right of self-defense does not imply the right of attack, can not be questioned. It was so held in the case of State v. Starr, 38 Mo. 270, and confirmed

in State v. Partlow, 90 Mo. 615.    When taken in connection
with instruction numbered 20, we find there can be no doubt
as to the correctness of instruction numbered 17.    (4)  An
objection is leveled at instruction number 18, and as reason
therefor the statement is made, first, that it singles out a cer-
tain fact and makes the whole case turn upon a finding of the
jury thereon; second, that it is not the law.    Upon closely
observing this instruction it will be found free from the crit-
icism made.    The authorities cited by defendant in support
of his onslaught upon this instruction are not in point.    No
such comment is made on the evidence or any part of it, as
is condemned in the case cited.    In fact there is no singling
out and commenting on evidence as to its force or effect.    It
is merely the statement of a principle of law which would pre-
vail in the event certain facts were found by the jury.    It
was a reasonable and necessary instruction, as much so as any
other, in view of the circumstances and evidence in the case.
(5)  It is not within defendant's right to complain as to the
caption of the instructions, although it was unnecessary to
have affixed to the same the word "murder," yet no injustice
or prejudice could, under any circumstances, be worked as
against the defendant.

SHERWOOD, J.—Indicted for murder in the first de-
gree for killing one R. H. Morgan with a shotgun on the sev-
enteenth of April, 1896, defendant being put upon his trial
was found guilty of the second degree of that offense, and his
punishment assessed at fourteen years in the penitentiary.

This homicide grows out of a disputed line, and a portion
of a disputed rock fence, which, if removed would open de-
fendant's field and leave it uninclosed, and besides, would
admit the water from the hillside to sweep over defendant's
field.    A lane running north and south divided the two
fences of defendant and of Hammond, that of defendant lying
on the west and Hammond's on the east of that lane which,
at its north end, opened into a public road which at this point

ran west on the north side of defendant's field. The north end of the lane terminated at the foot of a steep hill, which was the watershed of that immediate locality. The disputed boundary and rock lay between the northeast and the northwest corners of the respective fields. Hammond had lived on his farm about nineteen years and had never, so far as it appears, had any difference or difficulty with his vis-a-vis neighbor.

Defendant, forty-five years of age, had lived on his farm some fifteen years, in the county some thirty years, had been constable and justice of the peace some ten or twelve years, and bore an excellent reputation for being a peaceable and law-abiding citizen. On the other hand, Morgan, who had lived on the farm of Hammond, his step-father, for about the space of a year and had rented it, it seems, for the year 1896, had the reputation, as some of the testimony tends to show, of being of a rash, quarrelsome, turbulent and dangerous disposition, of which defendant was informed prior to the fatal occurrence, and he had been warned by some of his neighbors to be on his guard against Morgan. Indeed, it seems Morgan had conceived a strong dislike against defendant, and had made serious threats against him, and of these threats defendant had been told. About two weeks before the homicide, Morgan had gotten into an altercation with defendant's youngest son; had thrown rocks at him, and when remonstrated with by defendant on that occasion had invited defendant out of his field in order to beat him, saying to the latter that he had it laid up for him and intended to do him up.

Morgan was a large stout man weighing one hundred and seventy-five to one hundred and ninety pounds, and was about thirty-eight years old. Defendant had been prosecuted for obstructing the public road at the northeast corner of his field, and was convicted of that offense. On termination of this prosecution, defendant under the direction of the prosecuting attorney and sheriff as to where his fence should be

erected, had set his fence back on his line as it was ascertained
to be on the trial aforesaid, and he built this portion of the
fence of rock in order to prevent his field from being flooded.
After this building of his fence back on his line, defendant
was repeatedly annoyed by Morgan throwing this fence down,
when defendant would rebuild it.   This process of rebuilding
had just been completed just after noon of the day of the
homicide, by defendant and two or three of his nearest neigh-
bors.   In the afternoon, a passing neighbor, having informed
Morgan, who was at work in his field plowing, of the fence
being replaced, he immediately quit his work, sent his team
around by the bottom road, went by his house for his ax and
pistol, and with Hammond, his step-father, and Mrs. Ham-
mond, his mother, he went to where the rock wall had been
replaced, taking with him two chains.   The others of the
family, two grown women, and two boys, one twelve years
and the other younger, all went to what was termed the "rock
pile," as the rock wall at the *locus in quo* was called.   Arriv-
ing there, they all went to work tearing down defendant's
fence and placing the rock thus obtained on that of Hammond.
Defendant was in his field cutting sprouts; his son who was in
the field also and plowing, but somewhat nearer to the rock
wall than his father, saw Morgan and called his father's at-
tention to it, whereupon defendant looking up, saw Morgan
coming down the hill towards the rock wall, at a brisk walk
or run.   He had on his arm an ax and defendant thought he
saw him have also a pistol.   Behind Morgan were his step-
father and mother.   Defendant also noticed the others of
the party proceeding to the same point with horses, etc.
Thinking it prudent to do so, defendant went to his house
and got a shotgun and returned to the field and went towards
where Morgan and the others were tearing defendant's fence
down, and when defendant got within about thirty steps of
him where they were tearing the fence down, Morgan said to
him: "Don't come any closer."   Defendant told him to go

away and not to disturb his fence, when Morgan replied with foul and abusive language.

Whether defendant had his gun presented at Morgan at the time or not is the subject of conflicting evidence. Some of the testimony shows it was thus carried; other that defendant merely carried it in his hands, and other still, that it was on his shoulder. After testifying as above stated, with regard to what Morgan said to him, defendant continued: "I kept insisting that Morgan get away, that I didn't want any trouble with him, and that that was my fence, and he very well knew the court had so decided, and if he thought it wasn't, to go into court, and when the court decided it was his, he should have it, and not until then. He kept on abusing me, and then he had a pistol, the first I saw of it he was behind the wall from me, and he kind o' scooted down by the side of the tree, and I could just see the pistol and a little side of his face, and when he did that I turned and walked a few steps right around towards the lane; I was out from the lane a little ways, and about that time his mother came out and commenced quarreling at me, and I said to the old lady, 'I didn't come over here to quarrel with women, it would look better if you were at the house.' I told her I didn't come to quarrel with the old lady, and it would look better if she was at the house, and I happened to think of myself again, that it was perhaps done to draw my attention, and when I noticed Morgan again he was up and a few feet from the tree, and I says again, 'Go away and don't tear my fence down, and don't abuse me any more. I mean what I say.' I don't think I can repeat the language exactly that I used, and he stooped down and threw some rock from the wall and whirled around in that position (indicating), and that was the time the gun, I guess, fired very quickly. I was a southwest direction from Mr. Morgan, and he reached over just in this position and jerked some rock on, and as he raised up he threw himself in that position, and I thought he was going to draw his pistol, then I

fired.   I thought he was going to draw his pistol.   He was not over four or five feet from where he presented the pistol at me."

There was other testimony tending to show that defendant threatened to shoot Morgan in case he did not quit removing the rock, and that Morgan had his team attached to a stone and had just started to drive the team off, when defendant fired; that the exact words used by defendant to Morgan at that moment, were: "Damn you, if you move that I will shoot you," and Morgan answered: "You kiss my a—, you cowardly son of a b——," and started his team, and that witness did not see Morgan have a pistol.   The testimony of some of the witnesses corroborates that of defendant, and that of others is of a contrary effect.

The above statement affords a sufficient outline of the evidence to enable the law to be correctly applied to the facts thus recited.   Proper instructions were given on the questions of murder in the first and second degrees and they followed the usual formula.   If defendant killed Morgan with express malice, he would be guilty of murder in the first degree, but this remark is, however, to be qualified by this observation, that even if defendant did kill Morgan with express malice, yet if he did so in his necessary self-defense, it would not be murder though defendant bore express malice.   [State v. Rapp, 142 Mo. loc. cit. 447, 448.]

Relative to the question of self-defense, instruction 17 exhibits the insignia of that heresy which has so warped "the first law of nature" in this State that the original commentator thereon would not know that subject were he to encounter it in his pathway.   In the first place, it is not generally true that "the right of self-defense does not imply the right of attack."   This is something which depends upon the circumstances of each individual case.   A person about to be attacked is not bound to wait until his adversary gets "the drop

on him" or "draws a bead on him," to use familiar but significant expressions, before he takes steps to prevent those occurrences from taking place.

As was aptly said by Wagner, J., in State v. Sloan, 47 Mo. 612: "When a person apprehends that some one is about to do him great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, he may safely act upon appearances, and even kill the assailant if that be necessary to avoid the apprehended danger; and the killing will be justifiable, although it may afterward turn out that the appearances were false, and there was, in fact, neither design to do him serious injury nor danger that it would be done. He must decide at his peril upon the force of the circumstances in which he is placed, for that is a matter which will be subject to judicial review. But he will not act at his peril of making that guilt, if appearances prove false which would be innocence had they proved true."

Nor is it true that a party who expects to be attacked has no right "to put himself in the way of being assaulted," etc. So long as defendant did no overt act towards Morgan he had a perfect right to go where he would, and the expectation of being assaulted cuts no figure in the case. [State v. Evans, 124 Mo. loc. cit. 410, 411.]

Besides, defendant was on his own *terra firma*, and being there had the right to repel with force the removal of his fence, as this was a forcible trespass, and an invasion of his property rights. But he had no right to kill Morgan because the latter tore down his fence, or carried it off, and his act in killing Morgan unless done on the ground of self-defense, was not justifiable or excusable, but still it was not murder unless done with express malice.

On this subject Hawkins says: "Neither can a man justify the killing another in defense of his house or goods, or even of his person, from a bare private trespass; and therefore he that kills another, who claiming a title to his house,

attempts to enter it by force, and shoots at it, or that breaks open his windows in order to arrest him, or that persists in breaking his hedges after he is forbidden, is guilty of manslaughter." [1 Hawkins P. C. (6 Ed.), ch. 28, sec. 23, p. 108.]

And certainly the same rule would apply to tearing down a rock fence as would apply to breaking a hedge. Wharton says: "We may here repeat that it is murder for A. to deliberately kill B. for merely trespassing on A.'s property, A. at the time knowing that only a mere trespass was intended. The same rule applies, *mutatis mulandis,* to the vindication of the right to personal property. If the killing of the trespasser in either case take place in the passion and heat of blood, the killing is manslaughter, but unless it be in resisting robbery, it is not justifiable . . . . . . . On the other hand, when the defendant was not himself the aggressor, but was defending his own property from an assailant, he has a right to use as much force as is necessary to prevent its forcible illegal removal, or his exclusion from its use. It is true that when the wrong is slight, or can be otherwise prevented or redressed, a cool and deliberate killing of a trespasser is murder. But the question is mainly, Is an essential right of the party forcibly assailed? If so, he is entitled, in the absence of adequate legal remedy, to use such force as is necessary to repel the attack." [1 Whart. Cr. L. (9 Ed.) secs. 500, 501.]

These remarks of the learned author are fully supported . by the case of People v. Dann, 53 Mich. 490. In that case, an attempt was made to seize wheat, in the defendant's custody; he resisted the attempted seizure and emphasized that resistance with a loaded pistol. Being convicted of an assault with intent to murder Wilson, who attempted to seize the wheat and who also had a pistol, he appealed to the Supreme Court, and that court said: "Defendant was the owner and in possession of the farm, and Mrs. Layman of the wheat, and he acted for her in caring for it, and he

had a right to defend this property against the encroach-
ments by Wilson, and use so much force as was neces-
sary for that purpose.   It needs no citation of author-
ities to maintain this elementary principle of the law.   A
man is not obliged to abandon his farm, his home or his
goods to a trespasser or intruder unless he voluntarily chooses
so to do. . . . . . . It further appears that, having this right
to protect the property, the defendant, while in his efforts
to assert and maintain it, was confronted by a concealed
weapon used by Wilson against him, and in making his defense
against this attack used his own pistol.   This he had the right
to do if he feared, and had good cause to fear, his life was in
danger. . . . . . Upon the People's own showing in this case,
had death resulted, the defendant would have been guilty of
no more than manslaughter, and under all the circumstances
a new trial would be unnecessary.   The judgment of convic-
tion must be reversed and the respondent discharged."   [See,
also, 1 Whart. Cr. L., sec. 100; Com. v. Kennard, 8 Pick. 133;
Com. v. Power, 7 Met. 596; Beard v. United States, 158
U. S. 550; 1 Hale P. C. 485, 486; People v. Payne, 8 Cal.
341.]

Bishop, when speaking of cases represented by Com. v.
Drew, 4 Mass. 391, says: "The doctrine that passion excited
by trespass to property can never reduce the killing with a
deadly weapon to manslaughter, is too hard for human nature;
and though stated many times in the books, is not sufficiently
founded in actual adjudication to be received without further
examination.   For surely, though a man is not so quickly
excited by an attack on his property as on his person, and
therefore the two cases are not on precisely the same founda-
tion, yet since he has the right to defend his property by all
means short of taking human life, if in the heat of passion
arising in a lawful defense he seizes a deadly weapon and with
it unfortunately kills the aggressor, every principle which in
other cases dictates the reduction of the crime to the miti-

gated form requires the same in this case." [2 Bishop New Cr. Law, note, sec. 706.]

From these premises it should be concluded that instructions 15 and 23 given of the court's own motion were erroneous. They are the following:

15. "Although you may believe from the evidence that deceased was removing a stone fence belonging to defendant at the time he was shot, that would not justify or excuse him" (defendant).

23. "The defendant had a right to arm himself and go to any part of his own premises and forbid trespass thereon, but as before instructed, had no right to shoot deceased merely for removing stone defendant claimed to be his or on his premises."

The error in these instructions consists in this: That they do not go far enough, and are therefore to that extent erroneous and misleading. Because while it was true that defendant was not *excused* or *justified* in shooting Morgan for taking away stone which inclosed defendant's field or which belonged to defendant, and were used by him to prevent his field from being flooded, yet it was also true that if hot blood was engendered in defendant by seeing his fence or wall thus removed, he was not guilty of a higher grade of offense than manslaughter in the fourth degree; and these instructions should have been enlarged so as to embrace that point. And it is not the law that self-defense may not coexist with a right to have an instruction given, based upon manslaughter in the fourth degree.

Therefore judgment reversed and cause remanded. All concur.