# CHARLESTON.

## STATE *v.* B. L. GALFORD.

Submitted October 26, 1920.   Decided November 23, 1920.

1.  CRIMINAL LAW—*Witnesses—Defendant May Testify in His Own Behalf, and Testimony Must be Given Such Weight as it Merits.*

    A defendant charged with the commission of a criminal offense may testify in his own behalf at the trial, if. he so desires, and the jury cannot arbitrarily refuse to consider his testimony, especially when not contradicted directly or indirectly by any other witness and not inconsistent with the facts and circumstances of the case as made out by the evidence against him. but must give it such weight as in their judgment it merits.   (p. 363).

2.  HOMICIDE—*In Absence of Malice, Homicide Can Only be Voluntary Manslaughter.*

    Malice, express or implied, is an essential element of murder in the first or second degree, and if it is absent the offense is of no higher grade than voluntary manslaughter.   (p. 366).

3.  SAME—*"Malice" Implies a Mind Under the Sway of Reason and Excludes Idea of Sudden Passion.*

    The term "malice" implies a mind under the sway of reason. It excludes the idea of sudden passion aroused by an unanticipated and unprovoked assault brought about by an assailant without the fault of the person assailed.   (p. 366).

4.  SAME—*Sudden Intentional Killing with Deadly Weapon by One Not at Fault is Prima Facie Killing in Heat of Blood and Voluntary Manslaughter.*

    A sudden intentional killing with a deadly weapon, by one who is not in any way at fault, in immediate resentment of a palpably gross provocation, is prima facie a killing in heat of blood, and, therefore, an offense of no higher degree than voluntary manslaughter.   (p. 366).

5.  SAME—*Sudden Unintentional Killing with a Deadly Weapon by One Not at Fault Upon Gross Provocation Held Not Second Degree Murder.*

    When in such case the evidence discloses that no time intervened between the giving of the provocation and the act of killing, within which passion could have subsided and reason

regained its dominion, and the fatal act itself was not attended by circumstances of extreme cruelty and inhumanity, nor preceded by conduct from which malice can be inferred, a conviction of murder in the second degree should be set aside and a new trial allowed. (p. 367).

6. CRIMINAL LAW—HOMICIDE—*Instructions on Theory of Murder May be Given Where Evidence Tends to Prove it; Defense of Accident Does Not Preclude Charge on Offense Which Evidence Tends to Show; Instructions to be Construed as a Whole.*

Points 5, 6, and 7 of the syllabus of *State* v. *Clifford*, 59 W. Va. 1, approved and followed. (p. 367).

(WILLIAMS, PRESIDENT, absent).

Error to Circuit Court, Pocahontas County.

B. L. Galford was convicted of murder in the second degree, and he brings error.

*Reversed and remanded.*

*Roscoe H. Brunstetter, N. C. McNeil* and *A. M. Belcher,* for plaintiff in error.

*E. T. England,* Attorney General, and *Chas. Ritchie,* Assistant Attorney General, for the State.

LYNCH, JUDGE:

To reverse the judgment of conviction for murder in the second degree and confinement in the penitentiary for a period of fifteen years defendant B. L. Galford prosecutes this writ of error. Besides formal motions for a new trial and in arrest of judgment, he assigns as erroneous rulings on instructions, admission of evidence and duration of imprisonment.

Defendant admits the homicide charged in the indictment and seeks to exonerate himself from responsibility for infliction of the fatal wound upon the theory that it resulted, not from an intention on his part to commit a felony or inflict bodily injury upon George Duncan, the deceased, but from the accidental discharge of a revolver in his possesion, as police officer of the town of Marlinton, while they were engaged in a combat in which, defendant says, Duncan was the aggressor, and no witness contradicts him in this particular.

Until October 7, 1919, the town sergeant was the only officer charged with the duty of maintaining order and preventing reckless operation of automobiles and suppressing immoral conduct on the public streets and in places of common resort in the town of Marlinton. As other duties may have required him to devote all or the greater part of his activities to their performance and did not permit him to police the town in the nighttime, when such practices prevailed, residents of the town and particularly members of the board of trade urged upon the municipal authorities the necessity for additional police protection against injury by automobiles and flagrant immorality then apparently predominant in the municipality. In response to this appeal the authorities solicited and secured the services of Galford and assigned to him the duty of policing the streets and public places of the town between the hours of 2 o'clock in the afternoon and a like hour in the morning of each day of the week, and later if in his judgment the circumstances and conditions made the service necessary.

Suspecting the complicity of Duncan, a husband and father, in illicit sexual lewdness, and seeing him engaged on the streets in what Galford supposed was an effort to attract the attention of a certain woman, by casting gravel or other like substance against the wall or windows of the room or building occupied by her, he approached him and after some conversation too vulgar and profane to be detailed, admonished him of the impropriety of the conduct and advised him to return to his home. In this admonition and advice Duncan seemed to acquiesce without objection or protest and immediately acted as if his intention was to follow the direction so given. Whether he did or did not go to his residence does not appear. If he did, it was only for a moment as he soon returned to the main thorofares of the town and in the vicinity of the residence where Galford first saw him. Duncan frequently passed and repassed defendant while the latter was performing the duties allotted to him, and later entered the First National Bank building, ascended the stairway leading to the second floor, and shortly afterwards returned and stood on the steps of the building, where he and Galford met and there engaged in a combat in which Duncan

received the gunshot wound from which he died almost instantly.

No one but Galford knows which was the aggressor or how the revolver was discharged. No other witness offers any plausible reason or explanation for the assault or the manner of inflicting the wound, except that the instrument was the revolver Galford was authorized to carry and did carry at that time. Duncan did not have a revolver or other like dangerous weapon, though Galford swears he supposed he had armed himself after the first conversation. From the time the participants first met near the residence or room of the woman referred to until engaged in the combat about 11 o'clock at night, no other conversation was had between them, and prior to the combat there was between them not the slightest disagreement, estrangement or enmity, so far as the evidence shows. They were friends and their friendship theretofore was without interruption at any time or for any cause, so Galford says without contradiction. If there was cause to excite animosity on the part of Duncan towards defendant, that cause is traceable only to their first interview, and its effect on his mental attitude may be presumed from a remark made by him to Clyde Evans only a few moments before the conflict, when, after asking the latter if he had seen Galford, Duncan said Galford "had been following him around that night, and that he was going to slap him if he didn't quit following him, and laughed and walked off."

The state introduced and examined numerous witnesses, but the testimony of only three, in addition to that given by Galford, has any material bearing or significance as to the manner in which the injury that caused death was inflicted, and none of them saw how it occurred or happened. Those witnesses were Johnson, the janitor of the bank building before which the combat occurred, who during the whole occurrence was sitting in a chair in the basement of the building where he slept at night, Lightner and McAllister who jointly occupied a second story room directly across a 40-foot street, none of whom saw the fight at any time while it progressed, or knew how it began, or who was the aggressor, how the wound was inflicted, or

the provocation that produced it, until about the time, or after, the revolver was discharged, as their testimony discloses.

Though incoherent, Johnson's testimony, when properly understood, in substance and effect is: That while in the basement he heard some one up the street a considerable distance say: "By G——d, if I come down;" and he did come down towards the house; and about the same time Duncan reached the front door of the bank building. Johnson identified neither participant until after Duncan was shot. Looking through the basement windows he saw only the shadow of one man, who he supposed was Galford, because, when he went to the pavement immediately upon hearing the shot, Duncan was lying prostrate partly on the sidewalk and partly in the street. Also, according to his version of the affair, after "considerable conversation" between the two men, "whoever they were," he heard some one, who he also supposed was Duncan, say "Ah," though he confessed he "couldn't hear what was said," but "kind of recognized that." Shortly afterwards "there was a scuffle; the fence was loose and it jarred up against the house. They scuffled for quite a bit and then every thing became quiet and I couldn't hear anything." Within a few seconds some one, whose voice he did not recognize, said: "You will jump on me; you will? No you won't." "Then he (meaning Galford, as afterwards identified by him) advanced, the shadow showed, to the door, and his coat spread out, and as he came up he said: 'You will never curse me any more.'" And within "three or four seconds" after the scuffling ceased he heard the report made by the discharge of the revolver, and hurriedly went out of the building and there discovered Galford standing with his back against the fence and Duncan's body in the position described, the distance between them being about five or six feet, from which positions, when asked, he expressed the opinion that it was not possible for the shot to have been fired during the combat.

With more apparent frankness and intelligence, Lightner, Duncan's cousin, and McAllister admitted, as did Johnson, that they actually saw no part of the difficulty, and did not know how it originated. McAllister reached the window of the room occupied by Lightner and him as the shot was fired, and both corroborated Johnson as to the positions of Galford and Dun-

can's body immediately thereafter.  McAllister, however, swears
that when he reached the window and heard the report of the
revolver, Galford was near the fence and he and Duncan were
within one or two feet of each other, and Duncan fell outward
from him towards the edge of the sidewalk, thus in effect con-
futing or tending to confute the conclusion of Johnson as to
the impossibility of the shooting during the combat.

This testimony of the three witnesses, we repeat, is all that
bears directly upon the only substantial issue concerning the
death of Duncan, except that of Galford, and whether, when
weighed and considered and given full force and effect, it is
sufficient to sustain the verdict of conviction and sentence im-
posed is gravely doubtful.  Of its sufficiency in this respect we
do not stop to determine.

A defendant may elect, as Galford did, to testify in his own
behalf, and the jury impaneled to determine his guilt or inno-
cence of the offense charged against him must give due weight
and credit to his testimony.  They cannot arbitrarily refuse
to consider it, certainly when not contradicted directly or in-
directly by any other witness and not inconsistent with the
facts and circumstances of the case as made out by the evidence
against him, and convict him of an offense warranting the pun-
ishment required by the judgment—a punishment which his
counsel contend infringes upon the constitutional inhibition
against the imposition of cruel and unusual punishment.  For
a statute in force and effect in this state during many years
permits election by any person charged with the commission of
a criminal offense to testify on his own behalf at the trial, if
he so desires, and of course the jury must consider and give
such weight to his testimony as in their judgment it merits.

After repeating the remarks made by Duncan when he and
Galford first met, most of which we do not recite because of the
blasphemy, vulgarity and common profanity of the language
used, and other incidental circumstances already alluded to,
Galford proceeded with his explanation of the encounter and
the circumstances surrounding and leading up to it.  But first
of the disparity between their ages, weights and strength.  The
age of Galford was 55 years, his weight 150 pounds, and his
strength weakened by rheumatism, while Duncan was 38 years

of age, his weight 180 pounds, a man of strength and vigor, though possessed of the habit of using intoxicating liquors, and according to some proof, one of the state's witnesses agreeing, when intoxicated he was quarrelsome and resentful if offended.

The explanation given by Galford of the fatal affray is: When he saw Duncan, just before the trouble between them reached the acute stage, standing on the steps leading from the sidewalk into the First National Bank building, he approached the latter and remarked to him about it being a rainy night, then apparently free from animosity because he said he thought "the man wanted to talk" to him. "I didn't think there was a thing in the world between us; there wasn't on my part;" when there flowed from Duncan in reply language so foul as to forbid repetition, to which Galford replied: " 'I am advising you and don't want any trouble with you.' He started toward me and I backed down as far as I could get (25 or 30 feet.) He said something about my revolver; I cannot recall the words." And Duncan said "I will kill you;" which threat he accompanied by appropriate epithets. By way of further explanation of the circumstances Galford continued: "I had my left hand up to ward off the licks. He was going to strike at me. He grabbed hold of my right arm, I couldn't explain how. Then he hit me on the side of the face with his left hand, on the ear, and when I went to get my gun out of my pocket this way, it hung in my pocket. I didn't know how I had my gun out of my pocket, and when he hit me, he caught my hand over the gun and threw it up against my side here, and in the tussle in grabbing the gun it was pulled off in getting it loose. As far as my firing it wilfully, I didn't do it. I had the gun in my hand; I don't deny I had it in my hand. There is where the powder burned it on my coat, and it was hit right like that. The barrel must have went up through there (indicating a button-hole), and the coat folded over in that shape. It was bungled up in that position. I cannot explain how it was done. I was excited——a man big enough to beat the life out of me. * * * He was directly in front of me and had hold of my right arm some way. I don't know whether he let loose of that arm when he hit me. It stunned me a bit. My gun was up here, and when the shot was fired he was standing directly in front of me

and my position was rather in that position (indicating.).
When the gun cracked, Duncan had hold of my hand over. the
gun and fell over in the side ditch, and I went over back against
the iron palings."

In some particulars the evidence relied on to sustain the con-
viction and judgment corroborates Galford rather than refutes
what he says occurred.    Two surgeons who testified for the
state saw slight abrasions of the skin on Galford's face and ear
where he says he was hit by Duncan.   McAllister confirms his
statement as to the relative positions occupied by the combatants
when the shot was fired, and Johnson in that there was a fight
and that within three or four seconds after the struggle ceased,
as he thought, he heard the shot, and Evans in that Duncan
said he intended to slap Galford's face if he did not cease his
pursuit, and apparently Duncan did execute the threat at the
first favorable opportunity.    The wound inflicted by the bullet
also tends to corroborate the testimony of defendant.   It en-
tered Duncan's body to the left and slightly higher than the
umbilicus and from its entrance to its lodgment in or near the
spinal column its course was straight and horizontal.

In view of these facts, clearly established by proof, as to which
there appears no substantial disagreement, and if any, it is
referable to circumstances that have no decisive effect upon the
issues involved, it is of no consequence whether, when shot,
Duncan was drunk or sober, or whether, when drunk, he was
quarrelsome, vicious and resentful, if in fact he originated and
continued the assault upon defendant in the course of which,
he received the death wound.    In the absence of proof to the
contrary no plausible reason exists for rejecting as unworthy of
belief defendant's explanation of the manner the revolver
was discharged, at least to the extent of the degree of homicide
found by the jury.    Engaging in the fight is not alone suffi-
cient to sustain the finding and judgment, whether the wound
was inflicted intentionally, or, as defendant claims, accidentally,
if without fault on his part Duncan assaulted and beat him,
as the uncontradicted testimony makes plain, and that too
without reasonable justification therefor.    There is in the testi-
mony of Johnson, Lightner and McAllister as to what they
saw and heard, and Galford's explanation of the origin and

termination of the assault, nothing warranting the degree of guilt ascertained by the verdict and approved by the trial court. No evidence attributes fault to Galford. He is not impeached either directly or indirectly.

A homicide within the legal meaning of the term is not necessarily murder of either degree. It may be manslaughter either voluntary or involuntary, and in some instances it may be justifiable. To constitute murder malice is an essential element or factor. *State* v. *Douglas,* 28 W. Va. 297; *State* v. *Panetta,* 85 W. Va. 212, 101 S. E. 360. If this element be lacking, the killing is not murder, if an offense at all. This term, it has been said, implies a mind under the sway of reason. It excludes the idea of sudden passion aroused by an unanticipated and unprovoked battery inflicted by the assailant without the fault of the person assailed. If in such case the death of the aggressor results, even if intentional, it cannot be traced to a malignant heart but is imputable to human frailty. Passion and malice are not convertible terms, so that an act prompted by the one cannot be said to proceed from the other. *Brown* v. *Commonwealth,* 86 Va. 466, 473. And as said in points 10 and 11 of the syllabus in *State* v. *Clifford,* 59 W. Va. 1: "A sudden intentional killing with a deadly weapon, by one who is not in any way at fault, in immediate resentment of a gross provocation, is *prima facie* a killing in heat of blood, and, therefore, an offense of no higher degree than voluntary manslaughter;" and "when in such case the evidence discloses that no time intervened between the giving of the provocation and the act of killing, within which passion could have subsided and reason regained its dominion, and the fatal act itself was not attended by circumstances of extreme cruelty and inhumanity, nor preceded by conduct from which malice can be inferred, a conviction of murder in the second degree should be set aside and a new trial allowed."

Between the facts of the case cited and the facts of the case now reviewed there is a somewhat close analogy, and if there is any substantial difference between them, this case presents the stronger reason for relief. Galford was an officer of the law and when assaulted was discharging the duties imposed upon him by law at the time of his appointment. Faithfulness to

his charge and to those whom he was serving by the performance of a public duty, apparently without obvious fault on his part, does not warrant such severe condemnation as the verdict and judgment imply.

However, we are not to be understood as intending to foreclose further inquiry as to whether death ensued from the accidental discharge of the revolver, or whether, smarting under the effect of the assault and the blow administered upon the face of the accused, he purposely shot and killed deceased to prevent the infliction of a more serious bodily injury. For whether the one or the other, the homicide was not murder of the first or second degree. To this extent the verdict and judgment are without warrant of law and inflict an undeserved and unjustifiable penalty.

As instructions like those complained of by defendant were given in the trial of the Clifford case, which upon review for error were held by this court not inappropriate for ample reasons given by the competent author of the opinion (*State* v. *Clifford,* cited, points 5, 6, 7, syllabus), therefore they need not be restated, because, as we have remarked, there is between the facts of the two cases an unusual and approximate analogy. Nor is it necessary or proper to consider, and under our procedure, not unlike that of many other states in this respect, we cannot consider, rulings upon questions propounded by defendant at the trial to witnesses examined, because he did not then or at any other time state upon the record what the answers would be had they been permitted to answer the questions.

Wherefore, our order will reverse the judgment, set aside the verdict, and remand the case for a new trial.

*Reversed and remanded.*