STATE OF WEST VIRGINIA *v.* CARTER CASSIM

(No. 7184)

Submitted March 23, 1932.   Decided April 5, 1932.

*A. M. Belcher,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

MAXWELL, JUDGE:

Convicted of murder in the second degree and sentenced to serve five years in the state penitentiary, defendant prosecutes error.

Between seven and eight o'clock Sunday evening, January 29, 1928, defendant shot Ernest Smith in the former's place of business in Kanawha City. Smith died in a hospital the following morning.

Deceased and three or four companions, all under the influence of liquor, went to defendant's place of business, a small confectionery and pool room, about seven o'clock in the evening. Therein deceased and one of his confederates engaged in an altercation and fight with one George Love, deceased being the aggressor. Deceased and Love were strangers. The evidence is somewhat conflicting as to what actually took place thereafter. It appears, however, that Love appealed for aid. Several witnesses testified that defendant came to Love's assistance and demanded that the parties go outside to do their fighting; that he took deceased by the shoulder, not violently, and attempted to lift him off Love; that deceased struck defendant on the shoulder and knocked him down (there being a conflict here as to whether deceased had a pool ball in his hand) ; that as defendant attempted to arise, deceased struck him in the face; that as defendant was again endeavoring to arise, deceased "drew back" to strike him, and defendant, while in a half raised position, drew his pistol and fired two shots in rapid succession, the first into the floor and the second into the body of deceased. The ball took effect in deceased's right side, pene-

trating the liver. State's witnesses, Love and Wilson, stated that deceased and defendant had had no trouble, and that defendant, standing ten or twelve feet from deceased, and while deceased was looking in the opposite direction, drew his pistol and shot him. Wilson admits, however, that he heard Love appeal for aid, saying "he had enough"; that he heard defendant tell deceased to stop fighting and "to leave there"; that defendant asked him, Wilson, to take deceased out; and that it was only "a minute or so, a few seconds" after they got them—deceased and Love—separated until the shots were fired. He also testified that he was holding deceased away from Love at the time the shots were fired. He is not corroborated in this however. Love stated that he did not know who took deceased off him. There is evidence that there was a "knot" or lump on defendant's face, as from a blow, immediately following the fight.

The record discloses that deceased and defendant were strangers. Defendant stated that he saw him for the first time about four o'clock in the afternoon when he and his companions first came to the confectionery.

It is evident from the testimony of practically all the witnesses, both for the state and the defense, that defendant disapproved of the conduct in his confectionery of deceased and others. He insisted that they go on the outside to do their fighting. Several prominent citizens of Kanawha County testified to defendant's good reputation and standing in his community. The fact that earlier in the afternoon defendant had called the state police because of some drinking about his place of business of which he disapproved, tends to show that with the aid of the conservators of the peace he desired to preserve order about his premises. Defendant is an Assyrian and had been engaged in the mercantile business in the Kanawha Valley for more than twenty years.

There is evidence of threats made in the presence of deceased by his confederates in the course of the afternoon and again just before they went to defendant's place of business. They were not, however, directed at defendant by name. Some alleged statements of the deceased were ad-

mitted in evidence, but those of his associates were not admitted. Witness Warren was permitted to testify that, while talking with deceased and his associates about three or four hundred yards from defendant's place of business, and about forty-five minutes prior to the shooting, deceased said, "I am going down here and kill me a damn Wop." That when they left him they went in the direction of defendant's store. A witness by the name of Dunlap was permitted to state that in the afternoon, a while before the shooting, deceased said he "was going up the road either to kill that hunk or run him out of town". The court refused to permit witness Legg to testify that one of deceased's confederates, while just outside of defendant's confectionery a short time before the shooting, said to witness, "Let's go in and wreck this joint." The court likewise sustained an objection to the testimony of William Durbin that, when at the C. & O. depot in Charleston a short while before the shooting, "they" (meaning deceased and his companions) said they "were going up to Kanwha City and have a fight." Testimony of witness Legg that deceased stated in defendant's confectionery shortly before the shooting that "we come up here to. clean this place up" was not admitted by the court.

While it is true that, isolated and alone, these threatening statements would have little probative value inasmuch as they were not communicated to the defendant, yet, when considered with similar statements of deceased, properly admitted in evidence *(State* v. *Laura,* 93 W. Va. 250, 116 S. E. 251), they would, we believe, tend to show the mental attitude of deceased and his associates at the time and to characterize his conduct in defendant's confectionery. These statements should have been admitted and, in our opinion, their exclusion was prejudicial error.

Defendant complains of the court's refusal to admit certain evidence of some trouble in his place of business in the afternoon prior to the shooting, in which, however, neither deceased nor his confederates were involved. It is insisted upon defendant's behalf that it was admissible to show how he came to have in his possession the pistol with which he later shot deceased. This evidence, taken out of the hearing

of the jury, relates to some trouble between Hamilton and Ben Legg, brothers, and one Kuykendall and Harry Cooper. One of the Legg boys had a shotgun in his possession. They fought in defendant's confectionery. Defendant called the state police who did not come. Defendant's son took the pistol from a safe in the confectionery in the course of a quarrel between him and Hamilton Legg, and defendant took the pistol away from his son and put it in his own pocket. Although perhaps it was unnecessary for defendant to explain the possession of the pistol at the time of the homicide, he was entitled to the benefit of this evidence as tending to show that he had not prepared himself for trouble with deceased or any other person.

It does not appear that there was any ill feeling between defendant and deceased. Defendant, in relating the circumstances leading up to the shooting and in explaining the shooting, stated that he heard Love calling for help; that three times he told deceased and Casto, a confederate, to cease fighting with Love; that he took deceased by the arm; that deceased struck him twice, dazing him; that as he was attempting to rise a second time, he saw a pool ball in deceased's hand as the latter was about to strike him again; that he fired the first shot into the floor; and that he did not intend to fire the second shot.

It is unnecessary to cite authority for the proposition that malice is an essential element of murder, both at common law and under the statute. Malice may, of course, be express or implied, and may be implied from the use of a deadly weapon. This, however, may be rebutted by evidence of provocation, justification, or excuse. The presumption may be rebutted by a showing of circumstances of mitigation, as well as excuse. Wharton on Homicide (3rd Ed.), page 134; *Richardson* v. *Commonwealth,* 128 Va. 691. The presumption may be rebutted by the testimony of the accused that he did not intend to kill, *State* v. *Banks,* 73 Mo. 592; also by any other evidence than that which proves the killing, Wharton on Homicide, *supra,* and *Tesney* v. *State,* 77 Ala. 33. Such presumption may likewise be rebutted by a showing of extenuating circumstances, *State* v. *Cain,* 20 W. Va.

679; or any other facts and circumstances reducing the offense to manslaughter, *State* v. *Gravely*, 66 W. Va. 375, 66 S. E. 503. In the case at bar defendant, a man of good standing and reputation, peaceably endeavoring to maintain order in his place of business, interceded in a fight between deceased and another, provoked by deceased who was a stranger to defendant. If, on a sudden affray, a fight is begun without deadly weapons, and one of them uses a deadly weapon in the heat of blood and kills the other, it is manslaughter only. Wharton on Homicide (3rd Ed.), page 290; *State* v. *Ellick*, 60 N. C. 450, 86 Am. Dec. 442; *State* v. *McDonnell*, 32 Vt. 491; and *Preston* v. *State*, 25 Miss. 383. Where an affray is provoked by deceased, the use of a deadly weapon by defendant in killing deceased will not give rise to a presumption of malice. *State* v. *Galford*, 87 W. Va. 358, 105 S. E. 237.

The intervention by defendant was resented by deceased. Why did deceased not submit to peaceful ejection? It cannot be denied that defendant was in the right in seeking to maintain order in his store and in attempting to have the deceased refrain from further belligerency. Deceased and his companions were under the influence of liquor and apparently in search of trouble. Whether defendant was justified in shooting deceased or whether the shooting must be deemed to have been done unlawfully but not maliciously, is a question for jury determination under proper instructions.

It clearly appears that in the case at bar there was no premeditation, lying in wait, or malice aforethought. On the contrary, it was, at most, a sudden intentional killing with a deadly weapon by one not primarily at fault. This is *prima facie* killing in heat of blood. *State* v. *Galford*, *supra*. There was no previous grudge; deceased and defendant were strangers; the homicide was committed in the course of unanticipated conflict, and upon sudden provocation. These are such circumstances of extenuation that malice, and hence murder, cannot be presumed from the fact of the killing. *Richardson* v. *Commonwealth*, *supra*.

There being no evidence of malice, it follows that it was error to instruct the jury, at the instance of the state, that

it might, under the indictment, find defendant guilty of murder in the second degree. *State* v. *Hurst*, 93 W. Va. 222, 116 S. E. 248; and *State* v. *Laura, supra.*

Where a jury in a trial upon an indictment for murder, without sufficient evidence of malice, returns a verdict of murder in the second degree, this court on writ of error, will reverse the judgment, set aside the verdict and remand the case for a new trial. *State* v. *Hurst, supra.*

The judgment will be reversed, verdict set aside, and a new trial awarded.

*Reversed; verdict set aside; new trial awarded.*