STATE OF WEST VIRGINIA

*v.*

HENRY BOWYER

(No. 10873)

Submitted September 11, 1957. Decided December 19, 1957.

*Carl B. Vickers,* for plaintiff in error.

*W. W. Barron,* Attorney General, *Giles D. H. Snyder,* Assistant Attorney General, for defendant in error.

HAYMOND, JUDGE:

At the regular September Term, 1955, of the Circuit Court of Fayette County, the defendant, Henry Bowyer, was indicted for the murder of Jack Weeks in August

1955. To the indictment the defendant entered his plea of not guilty. At the trial which was held on January 16 and 17, 1956, during the regular January Term of that court, the jury returned a verdict which found the defendant guilty of murder of the second degree. The circuit court overruled the motion of the defendant to set aside the verdict and grant him a new trial and by final judgment entered May 14, 1956, sentenced the defendant to confinement in the penitentiary for an indeterminate period of from five years to eighteen years. To that judgment this Court granted this writ of error February 4, 1957, upon the petition of the defendant.

The homicide for which the defendant was indicted occurred about ten o'clock on Monday night, August 8, 1955, at a tavern operated by Weeks known as Log Cabin Tavern in the Town of Pax in Fayette County at which beer, soft drinks and food were served. The building in which the tavern was operated was a one story structure with an attic, had a main entrance at the front of the building, and contained at least one large room. To the left of the main entrance was a row of several booths, each of which consisted of two benches located against and at right angles to one of the side walls of the building with a table between the two benches in the booth. To the right of the main entrance and opposite the row of booths was a lunch counter, the top of which was about four feet above the floor and in front of which were at least three individual stools which were used by patrons served at the counter. Behind the counter were shelves and other equipment which contained food and supplies used in serving the customers. At or near the end of the counter farthest from the main entrance was a large refrigerator which extended above the top of the counter and on the counter near the refrigerator was a metallic cash register when the homicide occurred.

The defendant and Weeks, a married man thirty three years of age whose height was five feet eight inches and whose weight was 185 pounds, had been friends and ac-

quaintances for several years and, according to the evidence, no trouble had occurred between them before sometime in May 1955. At that time a quarrel occurred at Cirtsville in Raleigh County, during which Weeks, who was intoxicated, abusive, and armed with a revolver, shot at the defendant and the bullet from the revolver struck one of his shoes. Though he was arrested for some minor offense, he was never charged with or prosecuted for his attack upon the defendant. Later Weeks apologized and there was an apparent reconciliation between Weeks and the defendant.

Both before and after the trouble at Cirtsville the defendant was a frequent visitor at the tavern and his visits on different occasions lasted from a few minutes to several hours. The defendant and the wife and a ten year old son of Weeks were also friends and the boy and the defendant were frequently together. After the trouble at Cirtsville the defendant carried a .32 caliber Smith and Wesson revolver and he had it in his possession at different times when he visited the tavern.

A witness produced by the State testified that earlier during the same day on which the homicide occurred he and the defendant had a conversation about the trouble which had occurred between the defendant and Weeks at Cirtsville and that the defendant told the witness that he was not satisfied about it and that he could not let Weeks "run over him". Another witness produced by the State, who had been employed at the tavern by Weeks, testified that during the day before the day the homicide occurred the defendant spent several hours at the tavern while Weeks and his wife were away and at that time the defendant had a revolver in his pocket but that she did not see the defendant take it from his pocket or display it. This witness also testified that on the Tuesday preceding the Monday on which the homicide occurred the defendant was present at the tavern, also during the absence of Weeks and his wife, and that when the witness told the defendant that she was frightened by a boy who was also present the de-

fendant took a revolver from his pocket and gave it to her; that he then told her that if Weeks "ever pulled a gun on him that he was going to put him away in a white shirt"; and that sometime later that day, and after Weeks and his wife had come to the tavern, she returned the revolver to the defendant. Another witness produced by the State testified that about a week before the homicide occurred the defendant was in his truck parked about fifty or sixty feet from the tavern, that there was a revolver under a blanket on the seat of the truck, and that the defendant showed him the revolver. Jackie Weeks, the ten year old son of the deceased, testified that about two or three weeks before the homicide occurred the defendant had in his possession in the tavern the revolver with which he shot his father and that on another occasion he had seen the revolver in the glove compartment of the defendant's truck. He also testified that he saw the same revolver at the tavern when he came there a short time after the shooting had occurred and that the defendant told him that his father had shot first; that the defendant also told him to get a pint of whisky from his truck and throw it in the creek; and that he found the whisky and put it in the bathroom at the tavern where it was later found by a witness for the State after the boy told him where he had put it. Notwithstanding the foregoing statements of the defendant and the occasions when he had a revolver in his possession, the defendant did not at any time engage in any conduct or perform any overt act which indicated that he intended to make any attack upon Weeks or to induce or cause Weeks to attack him.

At the time the homicide occurred the only persons present and who saw what took place were Weeks, his wife Madge, the defendant, who had come to the tavern earlier that evening, K. T. Worrell, a police sergeant from Norfolk, Virginia, and David Gilpin of Havre de Grace, Maryland. Worrell and Gilpin were brothers-in-law and they had come to Pax to spend the night with their wives' parents who resided in Pax. They had been in Pax only a few minutes before they came to the tavern

shortly after nine thirty o'clock. They knew the defendant and they were also acquainted with **Weeks**. When they entered the tavern they went to one of the booths opposite the counter and distant from it approximately fifteen or eighteen feet. At that time Weeks was behind the counter and the defendant occupied a seat on one of the three stools in front of the counter or did so within a few minutes after Worrell and Gilpin went to the booth. They ordered some beer which Weeks brought to the booth where each of them occupied a seat on opposite sides of the table between the seats in the booth. Within a few minutes Worrell indicated to Mrs. Weeks, who at that time was also behind the counter, that he wanted another order of beer and she brought the beer to the booth and returned to her place behind the counter. Immediately after she did so Weeks fired one shot from a .32 caliber Smith and Wesson revolver which at the time contained five cartridges. The bullet struck the front of the cash register on the counter, ricocheted upward and broke the glass at the top of the machine but did not strike the defendant or Worrell or Gilpin. When he fired the shot Weeks was about four or five feet from the defendant with only the counter between them. Weeks then moved to his right near and partially behind the refrigerator and was standing at that place when the defendant drew a .32 caliber Smith and Wesson revolver which contained five cartridges, reached across the counter between him and Weeks, and fired one shot at Weeks. The bullet entered his left cheek, took a downward course, struck his fourth cervical vertebra and lodged in the right side of his neck. Weeks fell to the floor near and behind the refrigerator and, after telling his wife who immediately came to his assistance that he needed help and was going to die, became unconscious and remained in that condition until his death about forty hours later in a Beckley hospital to which he was promptly taken by a brother of Mrs. Weeks who at her request was called by Gilpin by telephone and arrived at the tavern within a few minutes after the shooting ended.

After the defendant fired at Weeks he turned in the direction of Worrell and Gilpin and put the revolver in his right coat pocket. At Worrell's request he handed the revolver to Worrell with the handle pointed to Worrell and said "I had to do it, didn't I?" He then asked Worrell to get Weeks' revolver. Worrell found it on the floor about twelve or eighteen inches from Weeks' head and took possession of the revolver. He later delivered both revolvers to a member of the Department of Public Safety who arrived at the tavern accompanied by another officer in about thirty minutes after the shooting occurred.

Both Worrell and Gilpin testified that they did not observe any unusual or hostile conduct upon the part of the defendant before the shooting occurred; that they suddenly heard the shot fired by Weeks immediately after they heard a sound which indicated that Weeks and the defendant were engaged in a scuffle; that an interval of only five to ten seconds occurred between the first shot fired by Weeks and the second shot fired by the defendant; that after the defendant fired his revolver he did nothing to indicate that he intended to harm anyone, to continue his attack upon Weeks, to retain possession of the revolver, to resist arrest, or to leave or escape from the tavern, but that he remained there quietly until the arrival of the police officers, one of whom placed the defendant under arrest, investigated the trouble, and talked to the defendant, Mrs. Weeks, Worrell and Gilpin each of whom gave him their individual versions of the manner in which the shooting occurred.

Mrs. Weeks, who was produced as a witness for the defendant, testified that, while she was sitting in a chair behind the counter a few feet from the place where Weeks was standing, the defendant was sitting on a stool in front of the counter; that he and Weeks engaged in a conversation about the health laws and the difference between what could be done in Fayette County and what could be done in Raleigh County; that Weeks told the defendant that a person could do whatever he

wanted to do if he had "enough pull"; that the defendant then said "If you feel that you have got that much pull I'll go tomorrow and get a warrant for you."; that Weeks then sat down on a cooler behind the counter, remained there "a few minutes", then got up and struck at the defendant with his fist; that before Weeks struck at the defendant the defendant had not said or done anything to cause Weeks to hit him except his statement that he would get a warrant for Weeks; and that after Weeks struck at the defendant she did not know what happened until after the shooting had ended.

Several witnesses produced in behalf of the defendant testified that they were acquainted with the general reputation of Weeks as a peaceable and law abiding citizen in the community and that his reputation as such was bad.

The defendant did not testify upon the trial as a witness in his own behalf.

Though the defendant assigns numerous errors to reverse the judgment of the circuit court, the controlling question presented is whether the evidence is sufficient to support the verdict of guilty of murder of the second degree.

If the evidence is not sufficient to support the verdict it is not necessary to discuss or consider the other alleged errors upon which the defendant relies to reverse the judgment of the circuit court.

To support the judgment of the circuit court the State contends that the possession by the defendant of a revolver on numerous occasions after the trouble between him and Weeks at Cirtsville and during his frequent visits to the tavern and his statements that if Weeks ever "pulled a gun" the defendant would put him away in a white shirt and that he would not permit Weeks to "run over him" establish malice upon the part of the defendant toward Weeks which continued until the time of the homicide and that the frequent visits of the defendant to the tavern were made by him for the

purpose of provoking a quarrel with Weeks which would provide an opportunity for the defendant to shoot and kill him.

On the contrary the defendant insists in substance that he was justified in carrying a revolver after the murderous attack which Weeks had made upon him at Cirtsville, in order to protect himself against any other similar attack and that the statements made by the defendant indicate only his intention to use the revolver in self-defense if Weeks should again attack him.

It is well established by numerous decisions of this Court that malice express or implied is an essential element of murder of the first or second degree. *State v. Morris,* 142 W. Va. 303, 95 S. E. 2d 401; *State v. Ponce,* 124 W. Va. 126, 19 S. E. 2d 221; *State v. Cassim,* 112 W. Va. 92, 163 S. E. 769; *State v. Roush,* 95 W. Va. 132, 120 S. E. 304; *State v. Hurst,* 93 W. Va. 222, 116 S. E. 248; *State v. Galford,* 87 W. Va. 358, 105 S. E. 237; *State v. Panetta,* 85 W. Va. 212, 101 S. E. 360; *State v. Douglass,* 28 W. Va. 297. Malice may be implied from the use of a deadly weapon. *State v. Morris,* 142 W. Va. 303, 95 S. E. 2d 401; *State v. Cassim,* 112 W. Va. 92, 163 S. E. 769. The presumption of malice may, however, be rebutted by showing mitigating circumstances, by excuse, by the testimony of the accused that he did not intend to kill, or by any evidence other than that which proves the killing. *State v. Morris,* 142 W. Va. 303, 95 S. E. 2d 401; *State v. Cassim,* 112 W. Va. 92, 163 S. E. 769. When, however, an affray is provoked by the deceased, the use of a deadly weapon by the defendant in killing the deceased will not give rise to a presumption of malice. *State v. Morris,* 142 W. Va. 303, 95 S. E. 2d 401; *State v. Cassim,* 112 W. Va. 92, 163 S. E. 769; *State v. Galford,* 87 W. Va. 358, 105 S. E. 237.

In *State v. Galford,* 87 W. Va. 358, 105 S. E. 237, this Court, discussing malice as an essential element of murder, said: "If this element be lacking, the killing is not murder, if an offense at all. This term, it has been said,

implies a mind under the sway of reason. It excludes the idea of sudden passion aroused by an unanticipated and unprovoked battery inflicted by the assailant without the fault of the person assailed. If in such case the death of the aggressor results, even if intentional, it cannot be traced to a malignant heart but is imputable to human frailty. Passion and malice are not convertible terms, so that an act prompted by the one cannot be said to proceed from the other." See *State* v. *Morris,* 142 W. Va. 303, 95 S. E. 2d 401.

In *State* v. *Clifford,* 59 W. Va. 1, 52 S. E. 981, this Court held in point 10 of the syllabus that "A sudden intentional killing with a deadly weapon, by one who is not in any way at fault, in immediate resentment of a gross provocation, is *prima facie* a killing in heat of blood, and, therefore, an offense of no higher degree than voluntary manslaughter." It also held in point 11 of the syllabus that when the evidence discloses that no time intervened between the giving of the provocation and the act of killing, within which passion could have subsided and reason regained its dominion and the fatal act itself was not attended by circumstances of extreme cruelty and inhumanity, or preceded by conduct from which malice can be inferred, a conviction of murder of the second degree should be set aside and a new trial awarded.

Before Weeks suddenly drew the revolver and fired at the defendant, the bullet striking the cash register instead of the defendant, the defendant had not made any threat of violence or committed any act of hostility against Weeks. His conduct until that moment had been peaceable and his statement to Weeks that he would get a warrant for him did not justify or could not be reasonably expected to provoke the sudden and unsuccessful attempt of Weeks to kill him. Weeks was the aggressor and he made an unprovoked attack upon the defendant by firing one shot from a revolver which still contained four unexploded cartridges. If the shot by him had not been deflected by the cash register but

had struck the defendant, as Weeks clearly intended it to do, it would have wounded and perhaps have killed the defendant. Though after firing one shot at the defendant Weeks sought cover near or behind the refrigerator he did not retreat or abandon or terminate the affray. He still held his revolver and he did nothing to indicate that he would not continue to fire at the defendant. This he could and evidently would have done if the defendant had not shot Weeks before Weeks was able to fire additional shots with his loaded revolver. Until Weeks fired at the defendant, the defendant had done nothing to indicate that he possessed a revolver; and no one saw a revolver in his possession until after he shot Weeks. All the foregoing facts are clearly established by undisputed evidence.

When Weeks shot at the defendant while he was on or near the stool in front of the counter the defendant was apparently facing the counter and the side wall of the room. The only door by which the defendant could leave the building was behind him and to his right. When Weeks fired and missed the defendant his only alternatives were to approach the door by moving backwards while facing Weeks; to turn toward and face the door and approach it with his back to Weeks; to remain inactive at or near the counter; or to draw his revolver and shoot Weeks before Weeks could fire a second shot. If the defendant had remained where he was and had not fired, or if he had endeavored to leave the building, he would have been a clearly visible and utterly defenseless target for any additional shots that Weeks should determine to fire. Instead of assuming a completely defenseless position, the undisputed facts and circumstances show that the defendant fired at Weeks with the intent to kill or disable him in the reasonable belief that it was necessary for him to do so to save his life or to protect himself from great bodily harm. His action in shooting and killing Weeks did not establish malice upon the part of the defendant, as, in the situation with which he was suddenly confronted, that action, even

if intentional, could not "be traced to a malignant heart" and was not malicious. See *State* v. *Morris*, 142 W. Va. 303, 95 S. E. 2d 401; *State* v. *Galford*, 87 W. Va. 358, 105 S. E. 237.

As malice is essential to support a finding of guilty of murder of the first or second degree, the verdict which found the defendant guilty of murder of the second degree, being based on evidence which fails to establish malice, either express or implied, on the part of the defendant, should have been set aside by the circuit court. When a verdict of a jury finding the defendant guilty is wholly without evidence on a point essential to such finding, or the evidence is plainly insufficient to warrant such finding by the jury, such verdict should be set aside and a new trial awarded. *State* v. *Morris,* 142 W. Va. 303, 95 S. E. 2d 401; *State* v. *Ponce,* 124 W. Va. 126, 19 S. E. 2d 221; *State* v. *Hurst,* 93 W. Va. 222, 116 S. E. 248; *Vintroux* v. *Simms,* 45 W. Va. 548, 31 S. E. 941.

The right of self-defense is not impaired by malice upon the part of an accused against a deceased or by mere intention or preparation by an accused to kill a deceased or inflict great bodily harm upon him if such malice, intention, or preparation is not accompanied by overt acts which are indicative of a wrongful purpose or are calculated to provoke an attack. 40 C. J. S., Homicide, Section 120; *Golden* v. *The State of Georgia,* 25 Ga. 527; *People* v. *Davis,* 300 Ill. 226, 133 N. E. 320; *State* v. *Matthews,* 148 Mo. 185, 49 S. W. 1085, 71 Am. St. Rep. 594.

In the absence of some act of the defendant which provoked an attack by Weeks, the possession of a revolver during some of the many visits to the tavern and elsewhere by the defendant and his nonaggressive but defensive statements to the effect that if Weeks attacked the defendant he would put him away in a white shirt and that he would not permit Weeks to molest him, all of which occurred after the trouble at Cirtsville, did not deprive the defendant of his right of self-defense. Those acts and statements did not deprive the

defendant of his right, in the event of an unprovoked attack upon him by Weeks, to use his revolver to kill Weeks if the defendant entertained a reasonable belief that it was necessary for him to do so to save his life or to save himself from great bodily harm at the hands of his assailant. *State* v. *Foley,* 128 W. Va. 166, 35 S. E. 2d 854; *State* v. *Doris,* 51 Ore. 136, 94 P. 44, 16 L. R. A., N. S., 660; *Thompson* v. *United States,* 155 U. S. 271, 15 S. Ct. 73, 39 L. Ed. 146; *Karr* v. *State,* 106 Ala. 1, 17 So. 328; *People* v. *Duncan,* 315 Ill. 106, 145 N. E. 810; *Woods* v. *State,* 183 Miss. 135, 183 So. 508; *Patterson* v. *State,* 75 Miss. 670, 23 So. 647; *State* v. *Bartlett,* 170 Mo. 658, 71 S. W. 148, 59 L. R. A. 756; *State* v. *Evans,* 124 Mo. 397, 28 S. W. 8; *State* v. *Rider,* 90 Mo. 54, 1 S. W. 825; *State* v. *Summer,* 55 S. C. 32, 74 Am. St. Rep. 707; *State* v. *Foutch,* 95 Tenn. 711, 34 S. W. 423, 45 L. R. A. 687; *Blackwell* v. *State,* 103 Tex. Cr. R. 423, 281 S. W. 213; *Richards* v. *State,* 86 Tex. Cr. R. 414, 32 S. E. 771, 216 S. W. 888; *Hammonds* v. *State,* 82 Tex. Cr. R. 387, 198 S. W. 944; *Airhart* v. *State,* 40 Tex. Cr. R. 470, 51 S. W. 214, 76 Am. St. Rep. 736; *Shannon* v. *State,* 35 Tex. Cr. R. 2, 28 S. W. 687, 60 Am. St. Rep. 17; *State* v. *Bristol,* 53 Wyo. 304, 84 P. 2d 757; Wharton on Homicide, Third Edition, page 518, Section 324; 26 Am. Jur., Homicide, Section 131; 40 C. J. S., Homicide, Section 120.

The judgment is reversed, the verdict is set aside and this case is remanded to the Circuit Court of Fayette County for a new trial which is here awarded the defendant.

> *Judgment reversed,*
> *verdict set aside,*
> *new trial awarded.*