# CHARLESTON.

### STATE *v.* ANDREW FRYE.

### (No. 5140.)

Submitted March 10, 1925.          Decided March 17, 1925.

1. CRIMINAL LAW—*Necessary Showing by Affidavit for Continuance Because of Witness' Absence Stated.*

Where a motion is made for continuance because of the absence of a non-resident witness, the affidavit in support thereof should not only show that the evidence of that witness is material and cannot be supplied by other witnesses in attendance, but also that there is a reasonable assurance that the evidence of the non-resident witness can and will be procured. (p. 508).

(Criminal Law, 16 C. J. §§ 921, 924, 925.)

2. HOMICIDE—*Killing as Immediate Sequence of Vicious, Continued, and Unprovoked Attack Upon Accused With Dangerous and Deadly Weapon Does Not Warrant Verdict of Second Degree Murder.*

Where in a trial for homicide the evidence does not show beyond a reasonable doubt that the fatal shot was fired with malicious intent, but, on the contrary, was fired as the immediate sequence of a vicious, continued and unprovoked attack upon the defendant by deceased armed with a dangerous and deadly weapon, a verdict of second degree murder is not warranted. (p. 509.)

(Homicide, 30 C. J. § 560.)
(NOTE:—Parenthetical references by Editors. C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, McDowell County.

Andrew Frye was convicted of second degree murder, and he brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

*Harman & Howard,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, PRESIDENT:

Convicted of second degree murder and sentenced to confinement in the penitentiary for five years, defendant prosecutes this writ.

The fatal shot was fired by defendant at the gate of Robert Lloyd, who was killed thereby. The shooting took place in Coalwood, McDowell County, on December 25, 1923, about noon. The killing took place under the following circumstances. Defendant had become acquainted with Beulah Griffith, a nurse who was in that neighborhood, having come there from Tennessee, and was paying her attention. An incipient courtship had begun between them. She had been for a week or ten days prior to the shooting and was at that time in the home of the deceased in attendance upon his wife, who had became convalescent and was able to visit in the neighborhood. Defendant and deceased were friends and on.

good terms. No enmity existed between them. While Beulah was in the Lloyd home as a nurse, defendant had called on her two or three times, and had called to see her the night before the shooting and was invited into the house, but being told that she was not in, he did not enter. It seems that Beulah had confided to Lloyd and his wife the fact that she was married and not divorced, though living separate and apart from her husband, and they had told her, upon that information, that it was not proper that she should receive the attentions of defendant, and that she should tell him so. There is no evidence that she told defendant as requested, or that he knew she was married. On Christmas day about noon and soon thereafter, defendant came to call upon Beulah and knocked at the front door of the cottage, which was composed of four rooms, and was admitted by a young man named Flippen who was visiting the Lloyds. Lloyd and his wife at that time were in their private room preparing to make some social call. Beulah was washing dishes in the kitchen and defendant went through the hall into the kitchen, and after talking with her for a few minutes, stepped out of the kitchen door with her onto the back porch, and was engaged in a conversation with her. Upon discovering that defendant was on the back porch talking to Beulah, Lloyd secured an iron poker from one of the front rooms, entered the kitchen and placed the poker by the door leading to the porch; then opened the door and asked Frye, defendant, "What was that you said?" to which Frye replied (according to Mrs. Lloyd's testimony), "Not a G———— d—— thing to you", and according to defendant's evidence, "Not anything to you"; but Flippen, the only other person in the house, did not just remember what was said. His impression was that defendant said, "damn it, or something like that." Thereupon Lloyd stepped back, picked up the poker and struck defendant a severe blow over the head with it, cutting the skin in two places, one an inch and a half longer than the other, the two wounds being separated about a half or three-quarters of an inch, evidently caused by the bending of the poker from the force of the blow. The physician, introduced by the State and who attended the deceased, dressed de-

fendant's wounds, and on cross-examination, he stated that
the effect of a wound like that on a person's head would
likely knock the recipient unconscious for two or three min-
utes. All the witnesses, except Mrs. Lloyd, say that defend-
ant's face and clothing were very bloody and that blood was
found near the porch and in the small yard. Just after the
blow was struck, Mrs. Lloyd came from her room to the
scene, having in her hand a clothes hanger the size of which
is not disclosed. She says she found her husband standing
on the porch with the poker in his hand, faced by defendant
who had drawn his revolver and was pointing it at her hus-
band. She says she disarmed her husband of the poker and
stepped between them, and insisted that defendant leave the
premises. Defendant says the blow knocked him off of the
porch and out into the yard where he fell on "all fours",
and that he was not conscious for a little while. He remem-
bered drawing his pistol after he turned the corner of the
building and had got nearly to the gate. The gate was thirty
feet from the place where the blow with the poker was de-
livered. Other witnesses, some of whom observed the diffi-
culty from near-by houses, say that defendant continually
backed away from Lloyd toward the gate, facing him all the
time, and that Lloyd had what they thought was an iron poker
in his hand, and that Mrs. Lloyd had something in her hand
which looked like a clothes hanger. When the gate was
reached, there is a sharp divergence of the evidence. Mrs.
Lloyd says defendant backed out of the gate which formed
the entrance through a small wire fence, and she closed the
gate; whereupon defendant reached around her with his re-
volver and fired the fatal shot. Two other witnesses, quite
a distance away, corroborate her somewhat in that state-
ment and say they did not at that time see the poker in the
hands of deceased. Beulah Griffith was not a witness, being
without the jurisdiction of the court at the time of the trial.
Flippen, who was visiting the Lloyds, was not introduced by
either side, but being in the courtroom, the judge put him
on the stand for interrogation. He says that after the blow
was struck at the porch and upon the approach of Mrs.
Lloyd, defendant backed away toward the gate, having drawn

his revolver, and was followed by Lloyd with the poker in his hand and by Mrs. Lloyd who was a little in front of her husband, and that when the gate was reached, it being open, Lloyd stepped aside and toward defendant, who was about three .feet from him, when the shot was fired. Defendant says that Lloyd attempted to strike him again with the poker when he reached the gate and was on his retreat, and that he fired to save his life or his person from great bodily harm, believing himself in great danger. It will be observed that the points of divergence in the evidence relate to whether or not Lloyd pursued defendant with the poker. Mrs. Lloyd states that she had disarmed him when she came out on the. porch, and two other witnesses who observed the affray from a distance, say that they did not see .the poker in Lloyd's hands at the time the gate was reached. All of the other witnesses, including defendant, and there were several of them, state that Lloyd pursued defendant with a poker in his hand in a rather threatening attitude, and that Mrs. Lloyd attempted to stay between them with the clothes hanger in her hand. Defendant's testimony does not exactly correspond with that of either side. He says he has no recollection that Mrs. Lloyd was pursuing him, that his attention was directed entirely to the man who had hit him the severe blow with the poker and was still advancing toward him. Evidently the severe blow with the poker, causing blood to run down his face, had obscured his vision to some extent, or it may be. that his mind had not cleared from the effect of the blow.

The points of error are: 1. That defendant was forced to trial in the absence of Beulah Griffith, who at that time had gone to her former abode in Tennessee. When the case was called, defendant's counsel stated to the court that she was absent; that a subpœna had been issued for her and a special messenger sent to Tennessee to serve it upon her; that she had accepted service and had stated that she would be at the trial if she was able; that money was left with her to pay her expenses; and that three days before the trial she had telegraphed to defendant: "Not able to come"; that counsel had talked with her and with the other witnesses, and that defendant could not safely go to trial without her

·evidence. The statement of the counsel then declared what facts could be proven by this absent witness, which are practically the same as testified to by the other witnesses, except ·that Lloyd still retained the poker in his hand while advancing upon defendant who was backing toward the gate, which would be in conflict with Mrs. Lloyd's evidence in that regard. The witness did not see the actual shooting. Upon this ·statement of counsel and upon the subpoena accepted by Beulah and her telegram being exhibited to the court, defendant rested his motion for a continuance. The court promptly overruled it. It does not appear that the State opposed the motion, the prosecuting attorney, so far as the record shows, remaining silent. Counsel for the defense did not introduce defendant as a witness on this motion, nor was there an affidavit filed in support of it. It is true that when defendant went on the stand he declared the whereabouts of Beulah and the efforts he had made to obtain her presence; but no statement is made as to what her evidence would be or its materiality. We do not think the defense has brought itself within the rule for obtaining a continuance; and such motion always being within the sound discretion of the court, we do not think the court abused its discretion in refusing the motion thus unsupported. Was there any certainty of her attendance at any future trial? *State* v. *Harrison,* 36 W. Va. 729.

2. The other point of error is that the evidence is not sufficient to support the verdict of second degree murder; that the element of malice is lacking. All homicide is presumed to be murder in the second degree and therefore malice is implied from the fact. If the State would elevate it into murder in the first degree the characteristics of that crime must be clearly proven; and if the defendant would reduce it to manslaughter or justification, the burden rests upon him. It may be shown by his own evidence or it may appear from the evidence introduced by the State. Murder, either in the first or second degree comes from the wickedness of the heart and involves deliberation and premeditation. It is true that malice may be formed quickly and there is no rule by which the time for the formation of malice can be

measured; whereas, manslaughter is committed in the heat of blood upon sudden and sufficient provocation. It usually occurs where there is a sudden brawl or quarrel, where there is no previous grudge and the provocation is sudden. Where these elements appear it cannot be said that legal malice can be inferred. The evidence is uncontradicted that defendant and deceased were friends and there was no grudge or ill feeling between them. Defendant did not know that deceased or his wife objected to his attention to the nurse at their home. That the provocation was sudden, serious and without justification is well established by the evidence for the State as well as by that of defendant. The assault was in the nature of a continuing one. Defendant was being ejected from the premises by violence, and under reasonable apprehension of bodily harm. The deceased and his wife were both following defendant in such a manner that he was compelled to keep his face toward them, evidently fearing a continuance of the viciousness of the assault. His condition at the time must be taken into consideration. Knocked unconscious and dazed, his faculties were possibly not so clear; can it be clear that he fired the fatal shot from pure viciousness of the heart and as a result of premeditation or deliberation? It was a very few moments from the time the serious blow was inflicted that the shot was fired. There was little time for premeditation or deliberation. Hot blood was aroused as well as the instinct of self-preservation. There was no cooling time. If defendant upon regaining consciousness from the blow, had immediately fired the fatal shot, it could not be questioned that the act engendered by the assault resulted from sudden passion. In the case of *State* v. *Hurst*, 93 W. Va. 222, defendant was sitting on the floor of the porch and the deceased, who was boisterous and intoxicated, came out of the house in a boastful manner, declaring that he was the best man in the house and did not want anybody to bother him. Upon remonstrance from defendant and with the remark that deceased had gotten hold of bad liquor, the latter approached defendant who arose from his sitting position on the floor and pushed the deceased away from him. This action was resented by deceased who thereupon made a motion

as if he was attempting to draw a revolver, when defendant picked up a paring knife lying near and inflicted the wound which resulted in the deceased's death. There had been no quarrel, and the deceased was engaged to be married to defendant's sister in a short time. No enmity existed between them. The jury found defendant guilty of second degree murder; and this court found from these circumstances that the evidence of malice was lacking and reversed the judgment. In *State* v. *Laura*, 93 W. Va. 250, the deceased, a man of rough and boisterous character entered the restaurant of defendant and began a disturbance. Upon remonstrance from defendant, he heaped abuse upon the latter and threatened to kill him with a stool which he picked up. At the request of defendant's wife, defendant left the restaurant, going out into an adjoining hall and up the steps to his living room. He was followed by the deceased, who broke the glass out of the door between the restaurant and the hall and then started up the steps. Defendant coming to the top of the steps upon hearing the crash of the glass, met deceased as he came forward, and fired the fatal shot. We held that no malice could be implied from these circumstances, and held it to be error to give an instruction telling the jury that they could find the defendant guilty of murder in the first or second degree. This case falls within the principle announced in the two cases last cited. The facts do not justify the verdict. No legal malice has been proved: The judgment will be reversed; the verdict set aside; and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*