STATE OF WEST VIRGINIA

*v.*

DONALD C. CLAYTON, JR.

(No. 14223)

Decided May 5, 1981.

---

*Askin & Burke and Steven M. Askin* for plaintiff.

*Chauncey H. Browning,* Attorney General, *S. Clark Woodroe,* Assistant Attorney General, for defendant.

PER CURIAM:

The appellant, Donald C. Clayton, Jr., was convicted of second degree murder by a jury in the Circuit Court of Morgan County. His principal challenge is the sufficiency of the evidence supporting the murder conviction.

The defendant was charged with shooting Paul Snidemiller in the early-morning hours of July 17, 1977. At the time of the killing, the defendant was 18 years old, a high school graduate, and lived with his parents. The shooting occurred in the parking lot of the Rock Gap Inn, a restaurant and tavern located in Morgan County several miles south of Berkeley Springs. The tavern was operated by Mr. and Mrs. Charles DeNeen, and their daughter Cheryl Fowler worked with them in the tavern on weekends. The defendant dated Cheryl Fowler and was therefore frequently on the premises.

Sometime prior to the evening of the homicide, Joseph Snidemiller, the brother of the victim, had been involved in a disturbance at the tavern and was consequently barred by the DeNeens from entering the establishment. When he refused to accept being barred, the DeNeens obtained an order from a Morgan County magistrate.

On the evening of the homicide, the victim, Paul Snidemiller, and his brother Joseph, along with their wives and some friends, spent the early-evening hours drinking and dancing at the Moose Club in Berkeley Springs. Sometime shortly after midnight, the group decided to go to the Rock Gap Inn. At the time the group arrived at the Inn, the defendant, Cheryl Fowler and Mr. and Mrs. DeNeen were all engaged in serving customers.

Although the accounts of the participants vary in detail, it appears that most or all of the Snidemiller party preceded Paul and Joseph into the tavern. When Paul and Joseph entered the door, Mrs. DeNeen approached them at

the entrance and instructed Joseph Snidemiller to leave since he had been barred from entering. Joseph initially refused to leave, provoking an argument between himself and the DeNeens. When Joseph ultimately agreed to leave, his brother Paul resisted, pulling Joseph by the arm and demanding that he stay. A tugging match ensued between the two brothers, which culminated with them falling onto the floor among the other patrons.

At this point, a fight erupted and there is conflicting testimony among the participants as to who were the aggressors. At one point during the fight, Mr. DeNeen was behind the bar fighting the victim, Paul Snidemiller, who had knocked Mr. DeNeen to the floor and proceeded to beat him unconscious. Cheryl Fowler came to the assistance of her stepfather and struck Paul Snidemiller with a pool stick and he retaliated by kicking Cheryl so severely that she later required hospitalization.

It is not disputed that the defendant did not participate in the fight, although at one point he did threaten "to blow someone away" upon discovering that Cheryl Fowler had been injured. The defendant left the tavern and attempted to call the police on the citizen band radio in his car. Upon failing to receive a response, he drove a short distance to his home, where he called the Berkeley Springs detachment of the state police but received no answer. He then telephoned the State Police Emergency Line in South Charleston and requested police assistance.[1] Following the

---

[1] The following transcript of this conversation with the State Police was introduced at trial:

"Date July 17th, 1977. Time 01:31. Johnson: State Police Emergency Line. Complainant: Yes, about six miles south of Berkeley Springs there's a fight going on, people bleeding and all. Johnson: Six miles? Complainant: Berkeley Springs. Johnson: Six miles south? Complainant: Yes, at the Rock Gap Inn. Johnson: Inside the place? Complainant: Yes, the Rock Gap Inn. Johnson: What route number is this? Complainant: Route 522 south. Johnson: What is your name sir? Complainant: Don Clayton, Junior. Johnson: Your last name is what? Complainant: Don Clayton, C-l-a-y-t-o-n, Jr. Johnson: Your phone number? Complainant: 258- 'and there's a question mark on the first number,' 274. Johnson: How many people are fighting? Complainant:

telephone call from his home, the defendant picked up a 30 caliber rifle and placed it in the backseat of his car. He then returned to the Rock Gap Inn.

By this time the victim and his brother and their wives had left the tavern, but there was still fighting continuing among the other patrons. Upon seeing the fight still in progress with no police present, the defendant again attempted to radio for help, without success. He then drove into Berkeley Springs to the State Police barracks, but found no one present. He left the police barracks and went to the Sheriff's office, which was deserted. Finally, he drove through Berkeley Springs sounding his horn in an effort to attract the attention of local police officers. Unsuccessful in all of these efforts, he returned to the Rock Gap Inn, coasting into the parking lot as the car ran out of gas.

The defendant reentered the Inn and found that the fighting had ceased, although numerous injured participants were present, and the police had still not arrived. Mr. DeNeen had left at this time and was driving down the highway to other nearby establishments in search of the victim and his brother. The defendant then returned to his vehicle, accompanied by Mrs. DeNeen, and again attempted to call for the police on his citizen band radio. Receiving no response, he attempted to contact the police on the radio in the DeNeen's car, which was parked next to his.

It was at this point that the Snidemiller brothers and their wives returned to the parking lot of the Rock Gap Inn. The defendant and Mrs. DeNeen testified that the Snidemiller vehicle circled the parking lot and stopped, facing the highway with its engine running. Paul Snidemiller got out of the car and began walking towards the defendant and Mrs. DeNeen, carrying a chain which was later found under his body. The defendant shouted at Snidemiller to leave, and when he continued to approach,

---

Pardon? Johnson: How many people are involved in the fight? Complainant: I don't know I left about the time it started. Johnson: Okay. Complainant: I want the law there. People are starting to get hurt. Johnson: Okay, thank you."

the defendant reached for his gun from his car. After again warning the victim to stop, the defendant fired twice, at which time the victim fell to the ground.

The Snidemiller's version is not materially different except that they claim Paul Snidemiller had no chain and that he was shot without warning after he had gotten out of the car and started toward the defendant and Mrs. DeNeen. They offered no explanation as to why they came back to the tavern.

Following the shooting, the defendant returned to his home and asked his father to call the police to report the shooting. When police and paramedics eventually arrived, they found the body of the victim lying on the parking lot covered with a blanket, and three rifle cartridges lying on the ground seventy feet away. The examining physician and paramedics testified that, upon the arrival of the body at the hospital, they removed the blanket and found a five- or six-foot heavy-duty chain lying upon the stretcher with the body. An autopsy revealed a level of .18% blood alcohol in the deceased.

The principal issue before us is whether the foregoing facts present sufficient evidence of malice to support a verdict of second degree murder. The general standard of review of the sufficiency of the evidence is set forth in Syllabus Point 1 of *State v. Starkey*, 161 W. Va. 517, 244 S.E.2d 219 (1978):

> "In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done."

*Starkey* also addresses the issue of malice, noting that malice, though not extensively defined, has always been recognized as an essential element to both murder in the

first and second degree. *Starkey* refers to the early decision of *State v. Douglass,* 28 W. Va. 297 (1886), which describes malice as "an action flowing from a wicked and corrupt motive, a thing done *malo animo,* where the fact has been attended with such circumstances as carry in them the plain indications of a heart regardless of social duty, and fatally bent on mischief." *State v. Starkey,* 161 W. Va. 517, 244 S.E.2d at 223-24, *quoting State v. Douglass,* 28 W. Va. at 299.

"Malice, express or implied, is an essential element of murder in the second degree, and if absent the homicide is of no higher grade than voluntary manslaughter." Syllabus Point 1, *State v. Galford,* 87 W. Va. 358, 105 S.E. 237 (1920); *see also State ex rel. Combs v. Boles,* 151 W. Va. 194, 198, 151 S.E.2d 115, 118 (1966); *State v. Jones,* 128 W. Va. 496, 37 S.E.2d 103 (1946).

This Court has on numerous occasions reviewed convictions of first or second degree murder where the appellant has argued the absence of malice. In *State v. Morris,* 142 W. Va. 303, 314-15, 95 S.E.2d 401, 408 (1956), the Court stated that:

> "If this element be lacking, the killing is not murder, if an offense at all. This term, it has been said, implies a mind under the sway of reason. It excludes the idea of sudden passion aroused by an unanticipated and unprovoked battery inflicted by the assailant without the fault of the person assailed. If in such case the death of the aggressor results, even if intentional, it cannot be traced to a malignant heart but is imputable to human frailty. Passion and malice are not convertible terms, so that an act prompted by the one cannot be said to proceed from the other."

*State v. Morris, supra, quoting State v. Galford,* 87 W. Va. 358, 366, 105 S.E. 237, 240 (1920).

*Morris* involved a barroom killing in which the defendant committed the homicide during the second of two unprovoked assaults where the victim was intoxicated and unarmed. Finding that the provocation was sufficient to

preclude the possibility of malice, the Court reversed the first degree murder conviction, holding in Syllabus Point 5:

" 'Where in a trial upon an indictment for murder there is no evidence showing malice, it is error to instruct the jury that it may find defendant guilty of murder either in the first or second degree.' Point 3, syllabus, *State v. Hurst*, 93 W. Va. 222 [116 S.E. 248]."

In *State v. Hurst*, 93 W. Va. 222, 116 S.E. 248 (1923), the defendant was convicted of second degree murder for the homicide of an unarmed but intoxicated assailant who was making an unprovoked assault on the defendant on the porch of his home. One witness testified that the defendant had previously remarked that he "had a notion" to kill the victim. Another witness testified that the defendant had stated "I am thinking of killing [the victim]." 93 W. Va. at 226, 116 S.E. at 249-50.

Despite these assertions, the Court found that the nature and circumstances of the encounter excluded any suggestion of premeditation or malice. In addition to holding in Syllabus Point 3 that, in the absence of a showing of malice, it is erroneous to instruct the jury regarding either degrees of murder, the Court also held that:

"Where the verdict of a jury is wholly without evidence on a point essential to a finding, or the evidence is plainly insufficient to warrant such finding by the jury, the verdict should be set aside and a new trial awarded; this rule applies, whether it be a civil or criminal case." *State v. Hurst, supra,* Syllabus Point 1.

For similar circumstances in which the Court has reversed murder convictions for the absence of evidence of malice; see *State v. Bowyer*, 143 W. Va. 302, 101 S.E.2d 243 (1958); *State v. Ponce*, 124 W. Va. 126, 19 S.E.2d 221 (1942); *State v. Thornhill*, 111 W. Va. 258, 161 S.E. 431 (1931); *State v. Frye*, 98 W. Va. 504, 127 S.E. 332 (1925).

In examining the record in the present case, it is apparent that the defendant in no manner provoked or encouraged the underlying disturbances at the Rock Gap

Inn. To the contrary, he alone among the participants went to extensive lengths to obtain the assistance of law enforcement officials. He withdrew from the scene as soon as the fighting erupted. Upon his return and finding the fight still in progress, he again left rather than participate in the brawl and renewed his search for police assistance. Although his rifle was in his car at this time, he resisted any use or threatened use of it and continued to attempt to secure police assistance.

While the jury was properly instructed on self-defense, because of the conflicting evidence and the distance involved at the time of the shooting it might have discounted this defense, but it should not have been instructed on either first or second degree murder since there was no proof of malice.[2] We note that the jury might well have been confused in this conviction since it returned a verdict stating "guilty of murder in the second degree but recommend mercy."

For this reason, the jury verdict is reversed and the judgment is set aside and a new trial awarded.

*Judgment reversed.*

---

[2] The relationship between voluntary manslaughter and a claim of self-defense is based on the degree of provocation, as we stated in *State v. Starkey,* 161 W. Va. 517, 244 S.E.2d 219, 225 n. 7 (1978):

"The term 'provocation' as it is used to reduce murder to voluntary manslaughter, consists of certain types of acts committed against the defendant which would cause a reasonable man to kill . . . . One of the most common types of provocation is an unprovoked assault on the defendant who responds in the heat of passion by killing the assailant. This ordinarily limits the degree of culpability to voluntary manslaughter. *State v. Morris,* 142 W. Va. 303, 95 S.E.2d 401 (1956). This situation is to be distinguished from the occurrence where the assault is not only unprovoked, but so extreme that the defendant reasonably views that his life will be taken or that great bodily harm will be done him, and he kills the assailant. Here self-defense, if found, will result in his acquittal. *State v. Cain,* 20 W. Va. 679, 700 (1882); *see also State v. Green,* W. Va., 206 S.E.2d 923, 926 (1974.)"